Michael D. BURCH and the Bankruptcy Estate of Michael D. Burch,[1] Plaintiffs,

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, Larry Vanderhoef, Greg Warzecka, Pam Gill–Fisher, Robert Franks, and Lawrence Swanson, Defendants.

No. CV.S–04–0038–WBS–GGH.

United States District Court, E.D. California.

June 5, 2006.

---

1. The complaint in this case was initially filed by plaintiffs as bankruptcy adversary action number 03–2492–B, related to bankruptcy case number 01–31315–b–7, in which the debtors are Michael Burch and Sylvia Burch. The adversary proceeding in the bankruptcy court was withdrawn by court order dated January 15, 2004 and renumbered as captioned here.

Anne Butterfield Weills, Dan Siegel, Siegel and Yee, Oakland, CA, Kristen Marie Galles, Law Offices of Kristen Galles, Alexandria, VA, for Plaintiffs.

*MEMORANDUM AND ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT*

SHUBB, District Judge.

Plaintiffs have filed claims against defendants for violations of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688, and 42 U.S.C. § 1983. These claims are based on allegations that defendants terminated plaintiff Michael D.

Burch [2] from his position as head wrestling coach at the University of California at Davis ("UCD") because he opposed defendants' sex discrimination against female athletes and publicly advocated on the athletes' behalf. Currently before the court are defendants two (separate) motions for summary judgment under Federal Rule of Civil Procedure 56. The first seeks summary judgment as to all defendants on both claims due to plaintiff's inability to show that he was retaliated against. The second seeks summary judgment on plaintiff's § 1983 claim against defendant Larry Vanderhoef.

## I. *Factual and Procedural Background*

Beginning in 1995, UCD employed plaintiff as its head men's wresting coach through a series of one-year contracts. (Compl. ¶ 5.) Plaintiff was classified as a part-time employee with the Athletic Department, but he also served as a lecturer in the Religious Studies Department starting in 1997. (*Id.* ¶ 6; Defs.' Statement of Undisputed Facts ("SUF") Ex. A (Warzecka Decl. ¶ 4).) At the time of plaintiff's termination on June 30, 2001, he was employed pursuant to a contract with the Athletic Department that started on July 1, 2000 and, by its terms, ended on June 30 of the following year. (Defs.' SUF Ex. M (contract).)

In addition to the Board of Regents of the University of California, which governs the University of California campuses including UCD, plaintiff is suing several UCD administrators for damages and his reinstatement. Defendant Larry Vanderhoef is the Chancellor of UCD. (Compl. ¶ 12.) Defendant Greg Warzecka is the Athletic Director at UCD and defendants Pam Gill–Fisher and Lawrence Swanson are Associate Athletic Directors. (*Id.* ¶¶ 13–14, 16.) Defendant Robert Franks is the Assistant Chancellor for the Student Affairs Department, which oversees the Athletic Department at UCD. (*Id.* ¶ 15; Defs.' SUF Ex. N (Franks Decl. ¶ 2).) In 2001, Franks supervised Warzecka, who in turn supervised Swanson (plaintiff's direct supervisor). (*See* Pl.'s SUF Ex. 15 (Franks Dep. 119:2–11); Defs.' SUF Ex. M (contract).)

The UCD men's wrestling team ("the team") competes at the Division I level of the National Collegiate Athletic Association ("NCAA"). (Compl. ¶ 29.) Prior to plaintiff's appointment as head coach, the team suffered six straight losing seasons. (*Id.* ¶ 32.) However, during the 1995–96 season, plaintiff's first year, the team won five dual meets. (*Id.* ¶ 33.) During his final year, the team won ten dual meets and, according to plaintiff, enjoyed its first winning season in twenty years. (*Id.* ¶ 37.) Additionally, the student newspaper, *The California Aggie,* named plaintiff "Coach of the Year" for the 1996–97 and 2000–01 seasons. (*Id.* ¶¶ 34, 37; Answer ¶¶ 34, 37.) In general, defendants do not dispute that the team's win-loss record, and the wrestling program overall, improved significantly during plaintiff's tenure. (Defs.' Mem. of P. & A. in Supp. of Mot. for Summ. J. 36.)

### A. *The Relationship Between Plaintiff and His Supervisors*

However, despite plaintiff and the team's success on the mat, defendants' documents submitted in support of the present motions indicate that a number of conflicts between plaintiff and his supervisors occurred over the years. The first

---

**2.** The bankruptcy estate of Michael D. Burch is also a plaintiff in this action because Burch's claims became assets of that estate when he filed bankruptcy on September 27, 2001. (*See* Mar. 16, 2004 Order 2 n. 2.) However, the court will refer to "plaintiff", meaning Michael Burch the individual, throughout this order.

conflict that plaintiff can recall occurred during his first year of coaching, when he approached Warzecka and expressed interest in teaching Physical Education classes. (Pl.'s SUF Ex. 13 (Burch Dep. 175:3–176:3).) Warzecka told plaintiff in a "condescending" tone that this opportunity was not available to him. (*Id.* at 175:20–25.) Another conflict occurred during plaintiff's second year, when he expressed his concern about his pay to Warzecka during contract discussions. (*Id.* at 176:4–11.) Warzecka allegedly told him that, in the future, he would put plaintiff's contract in plaintiff's box and he could either sign it or UCD would look for another coach. (*Id.* at 176:14–24.) Throughout plaintiff's tenure, he believed that he should have been paid more for his coaching activities. (*Id.* at 625:24–626:2.)

The next dispute concerned athletic scholarships.[3] When plaintiff began coaching, UCD did not offer athletic scholarships because of restrictions imposed by the Northern California Athletic Conference (of which UCD was a member). (Defs.' SUF Ex. A (Warzecka Decl. ¶ 5).) Shortly thereafter, the Athletic Department circulated proposals indicating that, pursuant to UCD's change in athletic conferences, athletic scholarships might be available in 1997–98 for the sports in which UCD participated at the Division I level (wrestling and women's gymnastics). (*Id.*) According to defendants, however, the fi-

nalized plan, approved in late 1996 by Chancellor Vanderhoef, authorized athletic scholarships to be issued starting the *1998–99* season. (*Id.;* Pl.'s SUF Ex. 16 (Warzecka Dep. 212:21–24).)

Nevertheless, while recruiting students to join the team for the 1996–97 school year, plaintiff represented to prospective students that scholarship money would be available to them beginning in 1997–98. (Pl.'s SUF Ex. 13 (Burch Dep. 158–59).) Plaintiff believes that Warzecka authorized him to make that promise. (*Id.* at 160:9–161:13.) Predictably, the athletes recruited by plaintiff and their parents complained in person to both Warzecka and plaintiff after learning that athletic scholarships would not be awarded in 1997–98. (*Id.* at 168–69.) This situation created tension between plaintiff and Warzecka that led to their participation in a university facilitated mediation.[4] (*Id.* at 172; Defs.' SUF Ex. AA (Mediation Settlement Agreement).)

Defendants also point the court to the failure of two female wrestlers[5] to complete documentation required by UCD to support their argument that plaintiff was lax in performing his oversight duties. (*See* Defs.' SUF Ex. II (Gill–Fisher Decl. ¶ 4 (wrestlers completed required paperwork and were allowed to return to practice)).) Plaintiff contends that he was not

---

3. Athletic scholarships are alternatively called "grants-in-aid" by the parties.

4. Plaintiff "denies", without support, this "characterization of the mediation." (Pl.'s SUF No. 25.) However, the non-movant in a motion for summary judgment cannot simply deny the moving party's stated material fact. "[T]he nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Weaver v. Ohio State Univ.*, 71 F.Supp.2d 789, 792 (S.D.Ohio 1998); *see also*

*Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir.1996) (requiring "the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment"). Moreover, in this instance, plaintiff's research into this fact is obviously incomplete, as the response submitted to the court still includes the assumed internal comment "WAS THIS THE REASON FOR THE MEDIATION?"

5. Although wrestling is a men's sport, women wrestlers were permitted to practice with the team, as discussed in more detail below.

required to ensure that the documentation was complete because it was not required of the female wrestlers by NCAA rules. (Pl.'s SUF Ex. 13 (Burch Dep. 435:21–437:6).)

The next dispute defendants cite involved documentation for $420 in recruiting costs advanced to plaintiff. On May 25, 2000, UCD recruiting coordinator Mitch Campbell wrote a memorandum to defendant complaining that defendant had not submitted an accounting of how the money was spent. (*Id.* Ex. PP (Campbell Mem.).) On June 13, 2000, plaintiff, Campbell, Gill–Fisher, and Jennifer Cardone, the Assistant Athletic Director for Compliance, met concerning defendant's continuing failure to submit his expense documents and resolved that plaintiff would submit the required documentation by June 16, 2000. (*Id.* Ex. RR (Minutes of June 13, 2000 Meeting).) "It was also established [at the meeting] that workload issues or employee status ... [would] not excuse [plaintiff] from turning in the required paperwork." (*Id.*)

Also in the spring of 2000, Warzecka conducted a meeting regarding UCD's plans for moving various coaching positions to full-time status. (*Id.* Ex. A (Warzecka Decl. ¶ 21).) The plan did not include the head coach of the wrestling team in the first round of changes. (*Id.* Ex. II (Gill–Fisher Decl. ¶ 5).) According to Gill–Fisher, at some point after the meeting, Burch asked her to amend the plan to make the wrestling coach a full-time position. (*Id.*) Gill–Fisher declined to offer her support for this change, stating that UCD needed to extend more full-time positions to female coaches to comply with Title IX. (*Id.*) Gill–Fisher alleges that, in response, plaintiff "blurted out '[f]uck Title IX,' and stormed out of [her] office." (*Id.;* Pl.'s SUF Ex. 17 (Gill–Fisher Dep. 564:3–565:23).)

The next dispute involved an open tournament on November 17, 2000 at Southern Oregon University. Plaintiff contends that the team was scheduled to participate in the tournament, and defendants contend that the team was not scheduled to do so: both have submitted schedules supporting these positions. (*See* Defs.' SUF Ex. AAA (defendants' version of 2000–01 wrestling schedule); *id.* Ex. BBB (plaintiff's version of 2000–01 wrestling schedule).) Compliance Director Cardone, concerned by plaintiff's alleged failure to schedule the tournament, conducted an investigation into the Oregon trip, looking for potential violations of intercollegiate athletics rules. (*Id.* Ex. JJ (Cardone Decl. ¶ 5).) The issue was apparently still unresolved several months later. Although plaintiff sent Associate Athletic Director Swanson an e-mail on March 26, 2001 claiming that all paperwork for that trip had been completed and submitted to Gill–Fisher, (*id.* Ex. DDD (Mar. 26, 2001 Burch e-mail)), Cardone declared that the required expense reports were not submitted until April, 2001. (*Id.* Ex. JJ (Cardone Decl. ¶ 5).) The investigation itself consequently continued until August, 2001—well after plaintiff's termination. (*Id.*)

In March, 2001, there was another dispute, again potentially involving NCAA violations, regarding a recruiting trip that plaintiff took to Stockton to watch the California State High School Wrestling Championships. Two of plaintiff's assistant coaches, Mike Collier and Beau Weiner, also attended the event. (Pl.'s SUF Ex. 13 (Burch Dep. 579).) Although plaintiff stated in his deposition that he met his assistant coaches there by chance and not by plan, (*id.* at 579:7–8), he claimed a hotel room for three people and meals for three people in his reimbursement form submitted to the university. (Pl.'s SUF No. 103 (admitted); Defs.' SUF Ex. JJJ (Stockton

trip documentation).) Under NCAA rules, only two coaches are permitted to recruit off-campus, and thus, according to defendants, attendance by the three coaches violated that rule. (*Id.* Ex. X (Cardone Dep. 132:1–25).) Furthermore, defendants also argue that because a volunteer coach like Weiner is not permitted to recruit off-campus, another NCAA rule was potentially violated by that same trip. (*Id.*)

After Cardone investigated the Southern Oregon University scheduling incident, the Stockton recruiting trip violations, and other potential NCAA rule violations, UCD self-reported plaintiff's perceived infractions. (Pl.'s SUF Ex. 125 (Nov. 7, 2001 Letter from Melvin Ramey to Christopher Strobel).) Although Cardone appears to have concluded that the scheduling discrepancies did not violate NCAA rules, (*id.* Ex. 126 (Cardone Dep. 129:10–13)), she did find that the Stockton recruiting trip, the use of a second volunteer coach, excessive time spent in Las Vegas following an authorized competition, excessive allowances for athletes' meal expenses, and plaintiff's failure to ensure that female wrestlers completed required paperwork all violated NCAA policies. (*Id.* Ex. 125 (Sept. 12, 2001 Letter from Cardone to Gill–Fisher).) This investigation was not complete when defendants made the decision not to renew plaintiff's coaching contract; however, it was certainly well underway in the spring of 2001.

In addition to pointing the court to these specific disputes, defendants allege that plaintiff was generally an unpleasant person to work with. "Throughout his employment with UCD, [plaintiff] had always complained about his pay." (Defs.' SUF Ex. A (Warzecka Decl. ¶ 20).) Additionally, "[plaintiff] often complained of being overworked." (*Id.* ¶ 22.) Gill–Fisher further described plaintiff as "confrontational." (*Id.* Ex. II (Gill–Fisher Decl. ¶ 16).) Associate Athletic Director Robert Bullis described plaintiff as "bullying" and unable to "understand the word no" when it came to budget discussions. (*Id.* Ex. R (Bullis Dep. 116–17).) Mary Schenk, the Management Services Officer for the Exercise Biology and Athletic Department at UCD from 1998 to 2002, stated that, during disputes about his pay, plaintiff would raise his voice at her and use profanity. (*Id.* Ex. CCCC (Schenk Decl. ¶ 2).) "Overall, [Schenk] found [plaintiff] to be rude and a difficult person to work with." (*Id.* ¶ 4.) Schenk complained about plaintiff to Bullis, among others. (*Id.*)

Finally, defendants also generally argue that plaintiff was unorganized. (*See id.* Ex. FFFF (Boyle Dep. at 126 (travel coordinator noting that plaintiff's submission of travel documents was late)); *id.* Ex. II (Gill–Fisher Decl. ¶ 17 (declaring that plaintiff violated policy concerning submission of receipts more often than other coaches)).) In three of plaintiff's six years with UCD, he ran budget deficits between $1,000 and $4,000.[6] (Defs.' SUF Ex. R. (Bullis Dep. 53:4–54:21); *id.* Ex. LLL (Bullis Decl. ¶ 5).)

In light of these disputes, defendants testified that Warzecka decided not to re-

---

**6.** Plaintiff argues that because the books did not close until June, 2001, defendants cannot claim to have legitimately fired him for running over budget during the 2000–01 season. (Pl.'s Opp'n to Defs.' Mot. for Summ. J. 40; *see also* (Defs.' SUF Ex. LLL (Bullis Decl. ¶ 5 (stating that plaintiff went over budget in the 1998–99, 1999–2000, and 2000–01 seasons))).) However, the team's season ended in March and defendant does not point to any sources of income that could have made up for any existing deficits. Moreover, plaintiff fails to cite to any support for his naked denial of defendants' facts regarding budget overruns and further admits to exceeding his budget in some years. (Pl.'s SUF Nos. 169, 170.)

new plaintiff's contract in a meeting with Gill–Fisher and Swanson on April 24, 2001. (Defs.' SUF No. 124.) Specifically, defendants provide the following reasons for the decision not to renew:

> (1) his inability to work effectively with senior administrators and Athletic Department staff members;
>
> (2) his long history exhibiting an unwillingness to abide by Athletic Department rules;
>
> (3) his continual and unreasonable demands for more pay, better facilities, and exceptions to Athletic Department policies;
>
> (4) his multiple years of carrying an unapproved deficit in his budget; and
>
> (5) his failure to cooperate during a pending investigation regarding possible NCAA violations.

(*Id.* No. 132.) Plaintiff, citing discrepancies in defendants' testimony that will be addressed in further detail below, argues in response that these were not the real reasons for his termination and further that the decision was not actually made on April 24, 2001. It is sufficient for now to note that plaintiff was not informed of the decision until May 29, 2001 and, according to his deposition testimony, defendants did not cite any of the reasons above in defense of their decision at that meeting. (Pl.'s SUF No. 206; *id.* Ex. 13 (Burch Dep. 714:1–715:14).) Additionally, defendants appear to have continued to actively negotiate the terms of plaintiff's contract for the 2001–02 season throughout the month of May, despite allegedly having already decided not to renew his employment. (Defs.' SUF Nos. 180–182; *id.* Ex. A (Warzecka Decl. ¶¶ 26, 28–29).)

### B. *Plaintiff's Advocacy on Behalf of Female Wrestlers*

Plaintiff submits that the real reason for the decision not to renew his contract was his self-styled "positive advocacy" on behalf of female wrestlers who practiced with his team.[7] (Defs.' SUF Ex. HH (Pl.'s Resps. to Interrogs. of UCD–2d Set, No. 39.) Although women had "unofficially" participated in the wrestling program before and during plaintiff's tenure, in the year leading up to plaintiff's dismissal, the opportunities for women wrestlers declined as a result of roster caps that were implemented to reduce costs and to balance the number of male and female varsity athletes at UCD. (*Id.* Ex. A (Warzecka Decl. ¶ 7)); Pl.'s SUF Exs. 20, 24 (UCD Wrestling Media Guides).) The wrestling team was officially capped at 30 and, either because the women could not beat any of the men for a spot or because defendants instructed plaintiff to remove women from the men's team,[8] the female wrestlers were not included on the 2000–01 roster.

---

**7.** Women's wrestling was not a varsity sport at UCD between 1995 and 2001. (Defs.' SUF Ex. II (Gill–Fisher Decl. ¶ 3).) Instead, women were permitted to practice with the men's team if they filled out the same paperwork as the male wrestlers. (*Id.; see also* Pl.'s SUF Exs. 20, 24 (UCD Wrestling Media Guides).)

**8.** The parties vigorously dispute who is responsible for the removal of the women from the roster. (Pl.'s SUF No. 66.) As suggested above, plaintiff stated that he was explicitly told to remove the female wrestlers from the roster while defendants declared that the 30, and later 34, available slots were given to plaintiff to fill as he saw fit, regardless of an athlete's gender. (*Id.* Ex. 13 (Burch Dep. 320:12–321:4); *id.* Ex. 17 (Gill–Fisher Dep. 407:14–411:9).) Defendants add that decisions regarding who to put on a roster are entirely within the discretion of the coach, not the Athletic Department supervisors. (Defs.' SUF Ex. II (Gill–Fisher Decl. ¶ 7).) Moreover, plaintiff testified that only one of the women wrestlers, Lauren Mancuso, had even a chance of beating one of the men on the team for a spot on the roster. (Pl.'s SUF Ex. 13 (Burch Dep. 218:16–220:16).)

Plaintiff asserts that he found this situation distressing and that he repeatedly challenged UCD's efforts to phase out women's wrestling. Specifically, plaintiff "tried to argue the point" when Warzecka "ordered the removal of the women from the wrestling program in October 2000." (Defs.' SUF Ex. HH (Pl.'s Resps. to Interrogs. of UCD–2d Set, No. 39).) When Warzecka threatened to terminate plaintiff in response, plaintiff "complied with the order under protest and wrote a memo to Defendants indicating that the women were removed from the program at [defendants'] request." (*Id.*) Plaintiff also insists that he participated in the female wrestlers' efforts to be reinstated. In January 2001, he "reminded ... Warzecka that the women wanted to be varsity" and further communicated that they wanted access to varsity benefits, including medical care. (*Id.* No. 40.) Plaintiff also states that he told Warzecka at this time that the women were "offended by Mr. Warzecka's treatment of them ...." (*Id.* (Pl.'s Resps. to Interrogs. of UCD–2d Set, No. 40).) Finally, plaintiff also spoke to Swanson "about these problems" around the same time. (*Id.*)

On April 24, 2001, three female wrestlers filed a complaint with the Office for Civil Rights of the United States Department of Education ("OCR") in which they alleged gender-based discrimination in violation of Title IX. (Pl.'s SUF No. 175, 175.) They also sent letters to Warzecka, Gill–Fisher, and Swanson on April 30, 2001 to inform them of the complaint. (*Id.* No. 175.) Within the first week of May, these defendants and Franks had all received notice of the OCR complaint in some form. (*Id.* Nos. 177–179.)

In their complaint, the women credited plaintiff with having made them aware that the "athletic administration's orders" to remove them from the wrestling team might constitute illegal sex discrimination. (Defs.' SUF Ex. QQQQ (Apr. 24, 2001 OCR Compl. ¶¶ 7–8).) Additionally, in the weeks that followed, plaintiff played an active part in the women's efforts to draw attention to their plight and their complaint. Through protests, newspaper articles, television broadcasts, and even a meeting with State Assembly Member Helen Thomson, plaintiff visibly supported the female wrestler's allegations of sex discrimination throughout the month of May. (Defs.' SUF Ex. HH (Pl.'s Resps. to Interrogs. of UCD–2d Set, No. 40).) He also started bringing up the reinstatement of women's wrestling as part of his ongoing contract negotiations, also in May. (Pl.'s SUF Nos. 183, 186–188, 222 (noting that the women's wrestling team issue was not a part of plaintiff's contract negotiations until May 14, 2001).)[9]

### C. The Claims at Issue

At an oral hearing on March 8, 2004, addressing defendants' motion to dismiss, the parties clarified the scope of this litigation and the defendants targeted by each claim. Plaintiff's first claim, for retaliation in violation of Title IX, is asserted only against defendant UCD. Meanwhile, claim two is asserted against all defendants except UCD and alleges that these actors violated § 1983 by firing plaintiff for exercising his First Amendment right to speak freely on a matter of public concern. De-

---

9. Rather than responding with *affidavits* or pointing to existing *evidence* in this case, as required by Federal Rules of Civil Procedure 56(c) & (e), plaintiff merely provides the unsworn *arguments* of his lawyers to refute the logical conclusion to be drawn from defen-dants' presentation of the evidence: that "the women's issue" was not initially part of plaintiff's contract discussions and did not come up in these negotiations until after the women filed their OCR complaint. (Pl.'s SUF No. 188.)

fendants in claim two are sued in both their official and individual capacities, thus making it possible for plaintiff to seek both prospective injunctive relief (his reinstatement as head coach of the wrestling team) and money damages from these individuals. (*See* Mar. 16, 2004 Order 4 n. 4.)

## II. *Discussion*

In this motion for summary judgment, defendants do not contend that they were unaware of plaintiff's activities in support of the women's complaint as of May, 2001. (*See* Defs.' SUF Ex. A (Warzecka Decl. ¶ 23); Answer ¶ 77 (admitting that plaintiff cooperated with the OCR investigation into the women's complaint).) They do, however, argue that prior to May 2001, plaintiff had never complained of discrimination per se. (*Id.*) Accordingly, because the decision not to renew plaintiff's contract was made in late April, defendants postulate that summary judgment is appropriate, given that they could not possibly have retaliated against plaintiff in April for his conduct in May. In the event that the court denies the requested relief, Chancellor Vanderhoef moves for dismissal of plaintiff's § 1983 claim as to him, arguing that as a remote supervisor, he did not have any direct involvement in any deprivation of plaintiff's constitutional rights, which is required for supervisory liability. The court will address these separate motions for summary judgment in turn.

However, the court must first address nearly 250 evidentiary objections raised by defendants on April 24, 2006. Defendants specifically target statements in the declarations of Michael Burch, Richard Seyman, Michael Maben, Charlie Hong, David Amato, and Earl Walker, Jr. (submitted in opposition to defendants' motions) and move to strike portions of these declarations. They also object to a substantial number of plaintiff's 176 exhibits submit-

ted in opposition to their motions, arguing generally that because these items were not introduced via a valid affidavit, "all of Plaintiffs' Exhibits that are not self authenticating" should be stricken. (Defs.' Evid. Objs. to Pl.'s Evid. 2.)

### A. *Evidentiary Objections*

In recent months, *every* motion for summary judgment on this court's calendar has been held up by "evidentiary objections" that have required the court to conduct hearings on the admissibility of evidence prior to addressing the merits of the motion. It appears to have become the "standard of practice" on summary judgment motions for attorneys to comb through the materials submitted by their opponents in search of any statement, phrase, or document which might in any way run afoul of the Federal Rules of Evidence, and to file objections on all conceivable grounds. In some of the larger law firms, newer attorneys are assigned to the case simply for that purpose. Only the attorneys and their clients know how many billable hours are spent on such endeavors.

Through these proceedings, the court has learned that the fount of this practice may be language contained in William W. Schwarzer et al., *California Practice Guide: Federal Civil Procedure Before Trial* § 14:107–111 (2005) (Rutter Group Practice Guide), wherein the authors counsel litigators to object to inadmissible evidence, "either orally or in writing, at or before the hearing," to preserve the objection for appeal, *id.* § 14:111. This advice seems to ignore the practice under the Local Rules of this court, similar to most others, which require the non-moving party to file its opposition to the motion fourteen days before, and the moving party's reply seven days before, the date of the hearing on the motion. *See* Local Rules 78–230 and 56–260. Inundating the court with detailed evidentiary objections by the

moving party less than two weeks before the hearing, and by the non-moving party less than one week before the hearing, can hardly lead to a meaningful hearing on the merits of the motion.

The court is mindful of the language in Ninth Circuit cases that "[d]efects in evidence submitted in opposition to a motion for a summary judgment are waived 'absent a motion to strike or other objection.'" *FDIC v. N.H. Ins. Co.*, 953 F.2d 478, 484 (9th Cir.1991) (quoting *Scharf v. U.S. Att'y Gen.*, 597 F.2d 1240, 1243 (9th Cir.1979)). However, the court cannot believe that the Court of Appeals would allow a summary judgment to stand which was based on evidence completely lacking indicia of admissibility simply because the opposing party failed to make an evidentiary objection. Regardless of whether a party objects, the Court of Appeals will always recognize plain error. Fed.R.Evid. 103(d); *McClaran v. Plastic Indus., Inc.*, 97 F.3d 347, 357 (9th Cir.1996). If consideration of the evidence would be so obviously improper and substantial, such that "failure to notice and correct it would affect the fairness, integrity, or public reputation of judicial proceedings[,]" a party could still challenge its consideration on appeal even if it initially failed to object to its admission. *Permian Petroleum Co. v. Petroleos Mexicanos*, 934 F.2d 635, 647–48 (5th Cir. 1991); *see also United States v. Sua*, 307 F.3d 1150, 1154 (9th Cir.2002).

Nevertheless, attorneys routinely raise every objection imaginable without regard to whether the objections are necessary, or even useful, given the nature of summary judgment motions in general, and the facts of their cases in particular. For example, objections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself;

yet attorneys insist on using evidentiary objections as a vehicle for raising this point. A court can award summary judgment only when there is no genuine dispute of *material* fact. It cannot rely on irrelevant facts, and thus relevance objections are redundant.

Instead of *objecting*, parties should simply *argue* that the facts are not material. Similarly, statements in declarations based on speculation or improper legal conclusions, or argumentative statements, are not *facts* and likewise will not be considered on a motion for summary judgment. Objections on any of these grounds are simply superfluous in this context. *See, e.g., Smith v. County of Humboldt*, 240 F.Supp.2d 1109, 1115–16 (N.D.Cal.2003) (refusing to rule on the evidentiary objections in defendant's reply because "even if the evidence submitted by plaintiff is considered by this Court, plaintiff fails to state a colorable claim"). Again, instead of challenging the admissibility of the evidence, lawyers should challenge its sufficiency.

Additionally, objections to the *form* in which the evidence is presented are particularly misguided where, as here, they target the non-moving party's evidence. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("We do not mean that the *nonmoving* party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment.... Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c) ...."); *Cox v. Amerigas Propane, Inc.*, No. CV–04–101, 2005 WL 2886022, at *2 (D.Ariz. Oct. 28, 2005) ("At the summary judgment stage, the court focuses on the admissibility of the evidence's contents, not the admissibility of its form."). Federal Rule of Civil Procedure 56(e), not the Fed-

eral Rules of Evidence, specifies the required format and significantly demands only that "[s]upporting and opposing affidavits ... set forth such facts as *would be admissible* in evidence ...." Fed.R.Civ.P. 56(e) (emphasis added).

As the Ninth Circuit has held, "to survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56." *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir.2003) (citing *Block v. City of L.A.*, 253 F.3d 410, 418–19 (9th Cir.2001)). In other words, when evidence is not presented in an admissible form in the context of a motion for summary judgment, *but it may be presented in an admissible form at trial*, a court may still consider that evidence. *Id.* at 1037 (considering evidence from a diary, notwithstanding the defendant's hearsay objections, in the context of a motion for summary judgment because the contents of the diary were "mere recitations of events within the [plaintiff/appellant's] personal knowledge and, depending on the circumstances, could be admitted into evidence at trial in a variety of ways"). Summary judgment is not a game of "Gotcha!" in which missteps by the non-movant's counsel, rather the merits of the case, can dictate the outcome.

■ Notwithstanding the foregoing, the court cannot overlook binding precedent where the Ninth Circuit has declared that at least some forms of evidentiary objections are appropriate in the context of summary judgment. Specifically, the Court of Appeals has "repeatedly held that 'documents which have not had a proper foundation laid to authenticate them cannot support [or defend against] a motion for summary judgment.'" *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1182 (9th Cir.1988) (quoting *Canada v. Blain's Helicopters, Inc.*, 831 F.2d 920, 925 (9th Cir.1987)). Consequently, objections predicated upon Federal Rule of Evidence 901 are appropriate in the context of a motion for summary judgment. This rule is consistent with the text of Rule 56, which indirectly allows courts to consider evidence other than pleadings, depositions, answers to interrogatories, admissions on file, and affidavits by permitting affiants to attach or serve "therewith" "sworn or certified copies of all papers or parts thereof referred to in [the] affidavit." Fed. R.Civ.P. 56(e).

Whether the authentication requirement should be applied to bar evidence when its authenticity is not actually disputed, is, however, questionable. Significantly, and as a matter of common sense, the Ninth Circuit has held that a district court's consideration of unauthenticated evidence in conjunction with a motion for summary judgment is harmless error when a competent witness with personal knowledge *could* have authenticated the document. *Hal Roach Studios, Inc. v. Feiner & Co.*, 896 F.2d 1542, 1552 (9th Cir.1990). Again, Rule 56(e) requires only that evidence *"would* be admissible", not that it presently *be* admissible. Such an exception to the authentication requirement is particularly warranted in cases such as this where the objecting party does not contest the authenticity of the evidence submitted but nevertheless makes an evidentiary objection based on purely procedural grounds.[10] *See Fenje v. Feld*, 301 F.Supp.2d 781, 789 (N.D.Ill.2003) ("Even if a party fails to authenticate a document properly or to lay

---

10. The court cannot stress enough that it does not behoove anyone to make objections simply for the sake of making objections.

a proper foundation, the opposing party is not acting in good faith in raising such an objection if the party nevertheless knows that the document is authentic.").

Similarly uncertain is how the court should approach hearsay objections to evidence submitted in opposition to a motion for summary judgment. Because "[v]erdicts cannot rest on inadmissible evidence" and a *grant* of summary judgment is a determination on the merits of the case, it follows that the *moving* party's affidavits must be free of hearsay. *Gleklen v. Democratic Cong. Campaign Comm., Inc.,* 199 F.3d 1365, 1369 (D.C.Cir.2000); *City of Tenakee Springs v. Clough,* 750 F.Supp. 1406, 1416 (D.Alaska), *rev'd on other grounds,* 915 F.2d 1308 (9th Cir.1990) ("Since summary judgment is a substitute for a trial on the merits, it is vital that the party opposing the motion be accorded the same evidentiary safeguards that would be applicable at trial ...."). Moreover, to some extent, the same rule would seem to apply to affidavits submitted by the non-movant, because if the non-movant is unable to cure the hearsay prior to trial, "the objective of summary judgment—to prevent unnecessary trials—would be undermined." *Gleklen,* 199 F.3d at 1369.

Yet the court cannot ignore the fact that a non-movant in a summary judgment setting is not attempting to prove its case, but instead seeks only to demonstrate that a question of fact remains for trial. Recognizing the significance of this difference, the Ninth Circuit long ago adopted "a general principle" whereby it "treat[s] the opposing party's papers more indulgently than the moving party's papers." [11] *Lew v. Kona Hosp.,* 754 F.2d 1420, 1423 (9th Cir. 1985); *Scharf,* 597 F.2d at 1243 ("[C]ourts

generally are much more lenient with the affidavits of a party opposing a summary judgment motion."); *see also Tetra Techs. Inc. v. Harter,* 823 F.Supp. 1116, 1120 (S.D.N.Y.1993) ("Material in a form not admissible in evidence may be used to avoid, but not to obtain summary judgment ...."); 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2738 (3d ed. 1998 & Supp.2005) (noting that some courts, including the Ninth Circuit, have applied a "double standard" to the admissibility of affidavits on summary judgment).

In practice, however, the Ninth Circuit has not consistently applied this principle. For example, in *Carmen v. San Francisco Unified School District,* the court noted that "on summary judgment, the non-movant's hearsay-laden declaration "would be enough to establish a genuine issue of fact." " 237 F.3d 1026, 1028–29 (9th Cir. 2001). But a year later, in *Orr v. Bank of America, NT & SA,* the court upheld the exclusion of depositions submitted *in opposition* to a motion for summary judgment because these exhibits contained inadmissible hearsay. 285 F.3d 764, 778–80 (9th Cir.2002); *see also Beyene,* 854 F.2d at 1182–83 (same).

In this court's opinion, the approach taken in *Carmen* was more sound, given that "[a]dmissibility of testimony sometimes depends upon the form in which it is offered, the background which is laid for it, and perhaps on other factors as well. It is therefore possible, and perhaps probable, that ... out of court [statements from an affidavit or deposition] will be admissible [through testimony at trial]." *Corley v. Life & Cas. Ins. Co. of Tenn.,* 296 F.2d 449, 450 (D.C.Cir.1961). Nevertheless, be-

---

11. Significantly, the practice guide that has apparently spawned the flurry of evidentiary objections that have besieged the court's law and motion calendar speaks only of "Objec-

tions to *Moving* Party's Evidence". Schwarzer et al., *California Practice Guide: Federal Civil Procedure Before Trial* § 14:107 (emphasis added).

cause *Beyene* predates *Carmen*, the current law in the Ninth Circuit is arguably that the rule against hearsay, Fed.R.Evid. 802, applies to evidence submitted in support of *and* in opposition to a motion for summary judgment. *See In re Watts*, 298 F.3d 1077, 1083–84 (9th Cir.2002) ("It is a bedrock principle of our court that the published decision of one three-judge panel binds every other panel from that day forward.").

As a practical matter, the court finds this entire exercise of considering evidentiary objections on a motion for summary judgment to be futile and counter-productive. If a court must hear up to hundreds of objections during one civil calendar in addition to the motion itself, then this procedure begins to defeat the objectives of modern summary judgment practice— namely, promoting judicial efficiency and avoiding costly litigation. *See Roberts v. Browning*, 610 F.2d 528, 531 (8th Cir. 1979). More importantly, even seemingly appropriate objections based on hearsay and failures to authenticate/lay a foundation are difficult to address away from the dynamics of a trial. During trial, when a party raises valid evidentiary objections, the opposing party will have an opportunity to present the evidence in an alternative and admissible form. At trial, a question can always be rephrased if an objection to it is sustained. Not so in the context of summary judgment practice.

As a further example, if one witness attempts unsuccessfully to testify about matters regarding which that witness lacks personal knowledge, another witness may later be able to testify to the same evidence based upon her firsthand knowledge. In the context of a motion for summary judgment, however, the court must often delay a hearing on the merits for several weeks to offer parties a chance to cure the defects raised by the objections.

The alternative is to throw litigants out of court on what may be deemed a curable technicality without a meaningful opportunity to respond—an approach that the court highly doubts the Ninth Circuit would condone. Again, this practice runs counter to summary judgment's assumed time-saving properties.

Under such circumstances it is tempting to throw up one's hands and simply say, as one court already has, that

> The device of summary judgment was conceived as a method of saving the time of the Court and litigants where the case is demonstrably spurious. Where, as here, the time and effort required for a satisfactory definitive resolution of the issues on the basis of the paper record presented on this motion might well exceed that required at a full-dress trial, the Court will not utilize the summary judgment procedure.

*Koleinimport 'Rotterdam' N.V. v. Foreston Coal Export Corp.*, 283 F.Supp. 184, 188 (S.D.N.Y.1968). Surely, if the moving party has to resort to 250 evidentiary objections to succeed on its motion, there must be a question of fact lurking in the 127 exhibits filed by defendants and 176 exhibits filed by plaintiff that defendants are attempting to hide from the court. Unfortunately, the court cannot "grant or withhold summary judgment merely because it would save time or expense." *Am. Mfrs. Mut. Ins. Co. v. Am. Broad.-Paramount Theatres, Inc.*, 388 F.2d 272, 285 (2d Cir.1967). Consequently, the court will proceed with any necessary rulings on defendants' evidentiary objections and then address the merits of the motions for summary judgment.

### 1. *Objections to Plaintiff's Affidavits*

As previously noted, defendants filed a 41 page brief attacking six declarations submitted by plaintiff in opposition to de-

fendants' motions for summary judgment. Significantly, however, plaintiff failed to cite to any of these affidavits with the required specificity in his opposition brief. On three occasions, plaintiff provided incomplete citations to the Burch declarations that failed to specify which of the two declarations plaintiff intended to refer to or which paragraph supported counsel's argument. Plaintiff's papers also cited the Seyman and Amato declarations once, again failing to specify which paragraphs supported his argument. Consequently, until defendants raised their objections, the court had not even read, and thus did not intend to rely on, any of the objectionable affidavits. *See Carmen*, 237 F.3d at 1031 (holding that whether or not evidence is attached to a brief in opposition to a motion for summary judgment, "Rule 56(e) requires that the adverse party's 'response,' not just the adverse party's various other papers, 'set forth specific facts' establishing a genuine issue").

Because defendants have thrown these affidavits into the spotlight however, the court doubts that it can rely on *Carmen* for the proposition that it need not consider their contents. The outcome in that case was driven by the fact that it would be "absurdly difficult for a judge to perform a search, unassisted by counsel, through the entire record, to look for" any and all "evidence that the lawyer wants the judge to read." *Id.* at 1030. Thanks to defendants, however, plaintiffs affidavits are no longer buried among the thousands of pages of evidence submitted in support of and opposition to the instant motions.

Nevertheless, defendants will ultimately prevail because plaintiff failed to take advantage of the court's allowance for briefing on the evidentiary objections. In response to the court's instruction that plaintiff "file a response to defendants' objections and/or amended declarations that cure the objections", plaintiff simply refiled nearly identical affidavits and a very general brief in which he contended that defendants' hearsay objections should be overruled because plaintiff's statements describe his "protected activity" and the discriminatory statements of others, which constitute an exception to hearsay. While this may be true, this broad argument does not help the court resolve defendants' 120 specific objections, which was the purpose of providing plaintiff with a chance to respond. Moreover, the court is unmoved by plaintiff's claims that he did not have enough time to prepare a more detailed response, given that plaintiff somehow managed to prepare, in addition to his "response" to defendants' objections, another 18 page brief on the merits of the summary judgment motions. (*See* Pl.'s Gen. Resp. to Def.'s Objs.) The court cannot be held responsible for plaintiff's lack of focus nor can it be expected to serve as plaintiff's lawyer and draft a legally supported rebuttal to defendants' objections. Consequently, because plaintiff has largely failed to respond to defendants' evidentiary objections to the Burch, Seyman, Maben, Hong, Amato, and Walker, Jr. declarations, these objections are sustained.

### 2. Objections to Plaintiff's Exhibits

In another 26 page brief, defendants separately raise an equal, if not greater, number of objections to plaintiff's exhibits. According to defendants, plaintiff only attempted to authenticate 20 of his 176 exhibits and based on this oversight, defendants generally move "to strike all of Plaintiffs' Exhibits that are not self authenticating." (Defs.' Evid. Objs. to Pl.'s Evid. 2.) Because defendants only generally raise this objection without specifying which of the numerous exhibits (some of which consist of several separate documents that might individually be self authenticating) are actually not self authenti-

cating, the court overrules this objection. The burden is on defendants to state their objections with specificity. *Cf.* Wright, Miller & Kane, 10B *Federal Practice and Procedure* § 2738 ("It follows that a motion to strike should specify the objectionable portions of the affidavit and the grounds for each objection. A motion asserting only a general challenge to an affidavit will be ineffective."). Moreover, because defendants do not actually dispute the authenticity of these documents, the court is confident plaintiff *would* be able to authenticate them at trial, which is all that Rule 56(e) demands.

Regarding defendants' specific objections to particular exhibits, the court largely declines to rule on admissibility because, in a serendipitous turn of events, it found it unnecessary to rely on most of the objectionable exhibits, with a few exceptions. First, the court overrules defendants' objections to exhibits 3–8 (plaintiff's responses to the interrogatories of various named defendants) because again, defendants have only very generally objected to these documents in their entirety based on the argument that they "contain" hearsay. The court is not inclined to comb through these documents, identify potential hearsay, and determine if an exception applies—all without guidance from the parties. *Cf.* Wright, Miller & Kane, 10B *Federal Practice and Procedure* § 2738 ("[A] motion to strike should *specify the objectionable portions* of the affidavit and the grounds for each objection." (emphasis added)).

Second, the court overrules defendants' objections to pages 714:11–715:14 of the

Burch Deposition in exhibit 13. Therein, plaintiff testified that defendants refused to disclose the reasons for his termination at the May 29, 2001 meeting. The statements and communicative acts attributed to defendants are not offered for their truth (in other words to show that defendants had no reason for firing plaintiff). Instead, they are offered to prove conduct from which the court can infer a discriminatory intent. Such statements are not hearsay. *See Calmat Co. v. U.S. Dep't of Labor,* 364 F.3d 1117, 1124 (9th Cir.2004) ("If the significance of an out-of-court statement lies in the fact that the statement was made and not in the truth of the matter asserted, then the statement is not hearsay.").[12]

Having addressed defendants' evidentiary objections,[13] the court is finally ready to proceed with the merits of these motions for summary judgment—nearly ten months after they were first filed.

### B. *Summary Judgment*

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment bears the initial burden of establishing the ab-

---

12. Additionally, the portions of plaintiff's deposition that defendants raise these hearsay objections to were solicited by *defendants'* attorney. It seems absurd to permit counsel the opportunity to object to her own line of questioning.

13. The court also relies on the UCD Wrestling Media Guides, (Pl.'s SUF Exs. 20–24), simply to describe the team and the wrestling program. Nothing in these guides actually impacts the court's analysis here.

sence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Alternatively, the movant can demonstrate that the non-moving party cannot provide evidence to support an essential element upon which it will bear the burden of proof at trial. *Id.*

Once the moving party meets its initial burden, the non-moving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)). The non-movant "may not rest upon ... mere allegations or denials of the adverse party's pleading ...." Fed. R.Civ.P. 56(e); *Valandingham v. Bojorquez,* 866 F.2d 1135, 1137 (9th Cir.1989). However, any inferences drawn from the underlying facts must be viewed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Additionally, the court must not engage in credibility determinations or weigh the evidence, for these are jury functions. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

### 1. *Claim One: Retaliatory Discharge in Violation of Title IX*

■■ Although not explicitly provided for in the text of statute,[14] the Supreme Court has held that an implied cause of action exists under Title IX for retaliation based on an individual's complaints of sex discrimination. *Jackson v. Birmingham Bd. of Educ.,* 544 U.S. 167, 125 S.Ct. 1497, 1504, 161 L.Ed.2d 361 (2005); *see also id.* at 1506 (reasoning that retaliation for advocacy of the rights of female athletes is "'discrimination' 'on the basis of sex.'"). In establishing this right, the Court observed that while Title VII, 42 U.S.C. §§ 2000e to 2000e–17, another discrimination law, explicitly provides for a detailed retaliation cause of action, Title IX very generally prohibits discrimination—so much so that its broad language encompasses an implicit claim for retaliation. *Id.* at 1501; *see also* 42 U.S.C. § 2000e–3(a) (Title VII retaliation provisions). The Court did not, however, provide guidance on how to evaluate a Title IX retaliation claim. In the absence of such guidance, the court will assess plaintiff's claim according to Title VII's well developed standards. *Ray v. Henderson,* 217 F.3d 1234, 1240 (9th Cir.2000) (applying the burden-shifting proof scheme from *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), in a Title VII retaliation case); *see also Johnson v. Baptist Med. Ctr.,* 97 F.3d 1070, 1072 (8th Cir.1996) ("[T]he method of evaluating Title IX gender discrimination claims is the same as those in a Title VII case."); *Preston v. Virginia ex rel New River Comm. College,* 31 F.3d 203, 207, 208 (4th Cir.1994) (holding that a Title IX discrimination claim can be evaluated in accordance with principles governing Title VII claims); *Weaver,* 71 F.Supp.2d at 793.

Accordingly, to survive this motion for summary judgment on his Title IX claim, plaintiff must first "prov[e][15] a prima facie

---

**14.** Title IX states only that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681.

**15.** Although the framework addresses burdens of "proof", the Ninth Circuit has made

case of discrimination based on opposition to [a discriminatory] practice." *EEOC v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1012 (9th Cir.1983); *see also McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. If he survives this hurdle, the burden of production shifts to the defendants " 'to articulate some legitimate, nondiscriminatory reason' for the adverse employment action." *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Finally, if the defendants meet their burden, the plaintiff has an opportunity to demonstrate that "the stated reason was not the defendant's true reason for acting, but a pretext for discrimination." *Id.*

A plaintiff establishes a prima facie case of retaliation by showing "that: 1) he engaged in a protected activity; 2) he [subsequently] suffered an adverse employment decision; and 3) there was a causal link between the protected activity and the adverse employment decision." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064 (9th Cir.2002). Significantly, complaining informally to a supervisor is a protected activity, as is complaining about the discriminatory treatment of others. *Ray*, 217 F.3d at 1240 n. 3. Additionally, "[c]ausation sufficient to establish the third element of the prima facie case may be inferred from ... the proximity in time between the protected action and the allegedly retaliatory employment decision." *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir.1987). However, if a plaintiff's causation arguments rest on the relative

timing of his protected activity and his dismissal, the plaintiff must also clearly show that the defendant was *aware* of the protected activity when the adverse employment decision was made. *Id.* at 1375 (citing *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 731 n. 1 (9th Cir.1986), for the proposition that "an employer's decision on a course of action made prior to learning of the employee's protected activity does not give rise to an inference of causation").

The parties do not appear to dispute that shortly after April 24, 2001, when the women wrestlers filed their discrimination complaint, defendants were aware of plaintiff's belief that sex discrimination in violation of Title IX had transpired. Plaintiff undeniably influenced the athletes' decision to file a complaint and he visibly supported their cause. Starting in May, and perhaps in late April, plaintiff actively "complain[ed] about the discriminatory treatment of others," which is a protected activity. *Ray*, 217 F.3d at 1240 n. 3.

■ Whether plaintiff was engaged in protected activity prior to April 24, 2001 is not as clear. Although informal complaints to a supervisor are protected, *see id.*, plaintiff's limited citations to interrogatories and deposition testimony in support of his motion do not establish that plaintiff complained of *discrimination* against the female wrestlers prior to May, 2001. Instead, plaintiff's evidence appears to show only that he appealed to his supervisors to recognize a women's varsity wrestling team.[16]

---

clear that "[a]t the summary judgment stage, the prima facie case need not be proved by a preponderance of the evidence." *Yartzoff*, 809 F.2d at 1375.

16. Plaintiff *contends* in his opposition brief that in March, 2001, he sought to "use the clout of his success [during the 2000–01 season] to push harder for the reinstatement of the women wrestlers." (Pl.'s Opp'n to Defs.'

Mot. for Summ. J. 26–27.) The brief states, without citing any depositions, answers to interrogatories, or affidavits, that at this time, plaintiff "asked Defendants Warzecka and Swanson to reinstate the women and reiterated his belief that Defendants had discriminated against them." (*Id.* at 27.) In general, the entire section of plaintiff's brief describing his "Extensive Protected Activity" is almost

This advocacy is not equivalent to a complaint of discrimination. *Cf. Jurado v. Eleven–Fifty Corp.*, 813 F.2d 1406 (9th Cir.1987) (holding that plaintiff failed to establish that he engaged in protected activity when he complained about the impact that an English-only rule would have on his reputation as a radio personality and only alleged that this same conduct was discriminatory after he was fired). Moreover, because establishing a women's wrestling team, as opposed to more varsity opportunities for women in general, was not required to comply with Title IX, the court cannot say that defendants should have interpreted plaintiff's inexact complaints as complaints of discrimination. *Cf. Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir.1995) ("A general complaint of unfair treatment does not translate into a charge of illegal ... discrimination."). (*See also* Pl.'s SUF No. 39 (recognizing that "Title IX compares actual participation opportunities for males and females, not the number of sports")).

Plaintiff may not be required to use "magic words" to engage in protected activity, but he did have an obligation to "at least say something to indicate [that gender was] an issue." [17] *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1008 (7th Cir.2000); *Mayfield v. Sara Lee Corp.*, No. C 04–1588, 2005 WL 88965, at *8 (N.D.Cal. Jan.13, 2005) (recognizing plaintiff's duty to "alert[ ] his employer to his belief that discrimination, not merely unfair ... treatment, had occurred"). Significantly, plaintiff has failed to point the court to any declarations or testimony where he described under oath how he objected to *gender discrimination* prior to May, 2001. Meanwhile, Warzecka has declared that prior to May, 2001, he did not construe any of plaintiff's opinions on the plight of the female wrestlers as allegations of gender discrimination. (Defs.' SUF Ex. A (Warzecka Decl. ¶ 16).)

■ Consequently, the court will only consider plaintiff's actions after April 24,

completely devoid of supporting citations that might direct the court to evidence that plaintiff accused his supervisors of discrimination, as opposed to merely pressuring them for a women's wrestling team, prior to May, 2001. (*Id.* at 19–33.) Perhaps recognizing this hole in his presentation, plaintiff relies on comments made to his co-workers that *could* have been heard by "anyone walking by" his office to support his allegations that his supervisors *knew* that he believed the women wrestlers were the victims of sex discrimination. (*Id.* at 37.) Plaintiff cannot successfully oppose defendants' motion for summary judgment with mere suspicions and undocumented arguments. *See S.A. Empresa De Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir.1982) (holding that "a party cannot manufacture a genuine issue of material fact merely by making assertions in its legal memoranda"). He must instead identify portions of the *record* that call into question the material facts of this case. In the absence of evidentiary support, the court is not obligated to "search the entire record to establish that it is bereft of a genuine issue

of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1480 (6th Cir.1989); *see also Newman v. Checkrite Cal., Inc.*, 912 F.Supp. 1354, 1377 n. 34 (E.D.Cal.1995) ("On summary judgment, where our Local Rule 260 requires the parties to cite to evidentiary record, it is not the court's job to go sifting through depositions looking for evidence.").

17. The Ninth Circuit has noted, in a discussion of retaliation for protected speech, that "an employee need not expressly accuse her supervisor or employer of illegal activity. Rather, [he] may convey an implicit message of disapproval of the illegality of the activity through her conduct by refusing to facilitate or participate in it." *Thomas v. City of Beaverton*, 379 F.3d 802, 809 (9th Cir.2004). Under this theory, plaintiff could assert that he refused to apply the roster caps to women as a means of protesting their discriminatory treatment. However, the court again notes that plaintiff has failed to identify portions of the record that would support such an inference.

2001 as evidence that he engaged in protected activity. Based solely on these undertakings, however, plaintiff can still establish his prima facie case, given that they occurred throughout the month of May, defendants were aware of them, and plaintiff was notified that his contract would not be renewed on May 29, 2001, shortly after these events. *See Miller,* 797 F.2d at 731 (holding that proximity of known protected activity and an adverse employment action can establish causation and, relatedly, plaintiff's prima facie case).

Plaintiff's evidentiary proof is thus sufficient to shift the burden to defendants and require them to provide a legitimate explanation for the decision not to renew plaintiff's contract. Accordingly, in their defense, defendants offer two explanations: (1) the decision was made on April 24, 2001, before they were informed of plaintiff's protected activities, and (2) the decision was made based on plaintiff's conflicts with other staff members, his disregard for Department rules, his unreasonable demands for more money, his repeated budget deficits, and his failure to cooperate during an investigation into possible NCAA violations. (Defs.' SUF No. 132.) Because defendants need only rebut plaintiff's prima facie showing, these simple arguments, supported by deposition testimony and other documentation, are sufficient to shift the burden of proof back to plaintiff. *Lynn v. Regents of Univ. of Cal.,* 656 F.2d 1337, 1344 n. 7 (9th Cir. 1981).

▬ To create a genuine issue of material fact sufficient to defeat summary judgment, plaintiff must now show "that the employer's articulated reasons are a mere pretext for what, in fact, is a discriminatory purpose." *Ferguson v. Wal–Mart Stores, Inc.,* 114 F.Supp.2d 1057, 1063 (E.D.Wash.2000). In response to this obligation, plaintiff identifies several inconsistencies in defendants' presentation that cast doubt on the reliability of their proffered reasons. Regarding the timing of the decision not to renew plaintiff's contract, plaintiff points out that there are discrepancies in Warzecka, Gill–Fisher, and Swanson's testimony regarding who attended the April 24, 2001 meeting where the decision to terminate his employment was allegedly made. There are also disputes over the input that each attendee provided. For example, Warzecka testified that Bullis contributed heavily, *at the meeting,* to the decision and further opined that "[Swanson] had less input than [Bullis] and [Gill–Fisher] and myself[ ] [because] he ... supervised [plaintiff] the least amount of time and had the least amount of interraction with [him] ...." (*See* Pl.'s SUF Ex. 16 (Warzecka Dep. 636:11–642:9).) In contrast, Swanson testified that Bullis was not present at the meeting, that Bullis was out of town that day, and that, based on his extensive relationship with plaintiff throughout his employment, he (Swanson) provided a long list of reasons not to renew plaintiff's contract. (*Id.* Ex. 18 (Swanson Dep. 11:16–12:21, 83:13–15, 111:10–12).)

Additionally, plaintiff notes that defendants continued to actively negotiate his contract for the 2001–02 season, despite allegedly having already decided not to renew plaintiff's employment. Defendants attempt to justify this conduct by explaining that, pursuant to Department policy, the decision not to renew a contract was not released until one month before the existing contract was set to expire. (Defs.' SUF No. 180.) However, plaintiff identified other instances where contracts were not renewed and the coaches were notified well in advance of the expiration of their existing contracts. (*See* Pl.'s SUF Ex. 16 (Warzecka Dep. 668:11–669:4).) Furthermore, *internal* communications show that

defendants were discussing in detail plaintiff's future employment and salary over a week after they had allegedly decided to terminate him. (Pl.'s SUF Ex. 101 (May 3, 2001 Email from Greg Warzecka to Dennis Shimek (specifying possible 2001–02 salaries that "we [UCD Athletics] would consider" for Mike Burch, depending on the results of an impending performance evaluation)).)

Cumulatively, plaintiff argues that this evidence supports his theory that the decision not to renew his contract was not made on April 24, 2001. Furthermore, based on defendants' seemingly inconsistent testimony, a reasonable fact finder could likewise conclude that the meeting did not take place when defendants allege it did and that the decision was actually made at some later date, when defendants were undisputably aware of plaintiff's protected activity.[18]

Plaintiff has also unearthed evidence that some of the reasons given by Warzecka for his termination were pretext. He identifies other coaches who ran over their budgets and defendants even admit that up to 30% of coaches run deficits "from as little as $100 to a maximum of approximately $5,000." (Defs.' SUF No. 172.) He also presents testimony from the UCD Assistant Athletic Director for Compliance, which revealed that UCD conducts about ten investigations into potential NCAA rule violations each year and that during plaintiff's six year tenure, he was the focus of these investigations on only two or three occasions. (Pl.'s SUF Ex. 126 (Cardone Dep. 124:18–125:9, 128:7–

15).) Additionally, plaintiff points out that Lennie Zalesky, plaintiff's replacement, testified that he has not been held to the same paperwork deadlines that plaintiff allegedly ignored. (*Id.* Ex. 133 (Zalesky Dep. 123:19–124:2, 126:11–13).) Most suspicious, however, was defendants' apparent failure to articulate any of these reasons, despite plaintiff's request for some explanation, at the May 29, 2001 meeting where plaintiff learned of his dismissal. (*See* Pl.'s SUF Ex. 13 (Burch Dep. 714:1–715:14 (testifying that defendants simply responded, "We don't have to tell you" and implied that plaintiff should "know by now … what the reasons are.")).)

Defendants contend that it was not one thing in particular, but rather plaintiff's cumulative record of infractions, that justified his dismissal. Significantly, plaintiff has not identified another similarly situated individual who butted heads with his superiors on the same volume of issues. (*Cf.* Defs.' P. & A. in Supp. of Mot. for Summ. J. 70 ("[N]o other coaches have presented as many problems as Plaintiff did.").) However, a "plaintiff may show pretext *either* (1) by showing that unlawful discrimination more likely motivated the employer, *or* (2) by showing that the employer's proffered explanation is unworthy of credence because it is inconsistent or otherwise not believable." *Dominguez–Curry v. Nev. Transp. Dep't,* 424 F.3d 1027, 1037 (9th Cir.2005) (emphasis added). The repeated instances where plaintiff has identified weaknesses and contradictions in defendants' proffered reasons satisfy the "unworthy of credence" prong of the pre-

---

**18.** The court recognizes that the Supreme Court has observed that "[e]mployers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Clark County Sch. Dist. v. Bree-* *den,* 532 U.S. 268, 272, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001). However, even assuming that this Title VII doctrine applies in a Title IX analysis, the evidence presented here suggests that the decision not to renew plaintiff's contract may not have been "along lines previously contemplated."

text analysis and cast sufficient doubt on defendants' explanation to permit a reasonable factfinder to infer that defendants did not act for the asserted reasons. *See Fuentes v. Perskie,* 32 F.3d 759, 764 n. 7 (3d Cir.1994) ("If the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder."); *Combs v. Plantation Patterns,* 106 F.3d 1519, 1538 (11th Cir.1997). Consequently, genuine issues of material fact preclude summary judgment on plaintiff's retaliation claim against UCD.

### 2. *Claim Two: § 1983 Liability for Infringing on Plaintiff's First Amendment Rights*

In addition to his Title IX claim against UCD, plaintiff is also suing his supervisors under § 1983 for retaliating against him for exercising his constitutionally protected right of free speech. "[T]o establish a prima facie case of retaliation under the First Amendment, [plaintiff] must show that (1)[he] engaged in protected speech on a matter of public concern; (2) ... defendants took an 'adverse employment action' against [him]; and (3)[his] speech was a 'substantial or motivating' factor for the adverse employment action." *Thomas,* 379 F.3d at 808; *see also Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). If plaintiff makes a prima facie showing, the burden shifts to defendants to demonstrate either that (1) their "legitimate administrative interests outweigh the [plaintiff's] First Amendment rights" or (2) that they " 'would have reached the same decision even in the absence of [plaintiff's] protected conduct.' " *Thomas,* 379 F.3d at 808 (quoting *Ulrich v. City & County of San Francisco,* 308 F.3d 968, 976–77 (9th Cir.2002)).

### a. *Summary Judgment for All Defendants*

 In the analysis in Part II.B.1, the court concluded that plaintiff has sufficiently demonstrated for purposes of summary judgment that he engaged in protected activity and that he suffered an adverse employment action shortly thereafter. Similarly, plaintiff has already satisfied the "substantial or motivating factor" prong of the prima facie analysis by identifying a question of fact as to whether at least some of defendants' "explanations for the adverse employment action were false and pre-textual." *Coszalter v. City of Salem,* 320 F.3d 968, 977 (9th Cir.2003) (identifying "three ways in which a plaintiff can show that retaliation was a substantial or motivating factor behind a defendant's adverse employment actions").

The remaining questions are therefore (1) whether plaintiff spoke on a matter of public concern; (2) whether defendants' legitimate administrative interests outweigh the plaintiff's First Amendment rights; and (3) whether defendants would, in the absence of plaintiff's protected conduct, still have elected not to renew his contract. The first question can be quickly disposed of, as the Supreme Court has recognized that speech protesting discrimination involves "a matter inherently of public concern." *Connick v. Myers,* 461 U.S. 138, 148 n. 8, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Givhan v. W. Line Consol. Sch. Dist.,* 439 U.S. 410, 412–13, 417, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979) (implicitly holding that complaints of discrimination are matters of public concern). The second question, regarding defendants' legitimate administrative interests, is also easily dispatched because defendants bear the burden of establishing such an interest and they failed to explicitly

make this argument in their moving papers.[19]

■ The third and final question is decidedly more difficult. Defendants can still prevail on their motion for summary judgment if they can "demonstrat[e] that [they] would have made the same decision absent the forbidden consideration." *Texas v. Lesage,* 528 U.S. 18, 20–21, 120 S.Ct. 467, 145 L.Ed.2d 347 (1999) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). To demonstrate this, defendants discuss at length the deteriorating relationship between plaintiff and his supervisors. In particular, defendants cite to their depositions, where they testified that as early as February, 2001, they started having discussions about not renewing plaintiff's contract because he was "always confrontational", failed to follow policies and procedures, and had philosophical differences with administrators over how to achieve Title IX compliance.[20]

(Pl.'s SUF Ex. 16 (Warzecka Dep. 574:14–25, 576:1–12, 578:14–19, 567:24–568:24, 572:25–574:11).) Plaintiff does not dispute that the decision not to renew his contract "had been contemplated since early 2001." (*Id.* No. 130.)

Nevertheless, the fact that defendants were *contemplating* a decision not to renew plaintiff's contract does not show that they *would* have taken the same action in the absence of any protected activity. *See Allen v. Scribner,* 812 F.2d 426, 435 (9th Cir.1987) (noting that even though "insubordinate conduct *might* have justified an adverse employment decision, [this] does not suffice" to show that the plaintiff *would* have received the same treatment (emphasis added)). Particularly troubling is plaintiff's evidence which suggests that his participation in public protests accusing UCD of Title IX discrimination might have been the event that actually secured his termination. (Pl.'s SUF Ex. 5 (Pl.'s Resps. to Interrogs. of Robert Franks, No.

---

**19.** Defendants perhaps implicitly make this argument in their discussion of *Lewis v. Smith,* 255 F.Supp.2d 1054 (D.Ariz.2003), however, that case is factually distinguishable. To shore up its primary holding that plaintiff had not spoken on a matter of public concern, the court in *Lewis* held that the defendants "had a legitimate interest in maintaining the effective functioning of [a] small coaching staff" and this interest outweighed the plaintiff's "limited First Amendment interest." 255 F.Supp.2d at 1071. In contrast, Burch's First Amendment interest in publicly supporting the women wrestlers' discrimination complaint is not a "limited" one. Moreover, he *did* speak on a matter of public concern. *See also Bernasconi v. Tempe Elementary Sch. Dist. No. 3,* 548 F.2d 857, 862 (9th Cir.1977) ("[Where] public statements made by the plaintiff were directed primarily at a general practice rather than at named individuals, the court finds the balance to tip in favor of the [plaintiff's] right to speak." (quoting the underlying District Court order)).

**20.** The "philosophical differences" refer, in part, to plaintiff's arguably unique perspective on Title IX. (Defs.' SUF Ex. A (Warzecka

Decl. ¶ 29).) As previously explained, defendants implemented a roster management plan for the purposes of reducing costs and achieving greater proportionality between the number of male and female varsity athletes. (*Id.* (Warzecka Decl. ¶ 7).) Pursuant to the plan, the number of spots for males on the varsity team rosters at UCD were capped. In response to this change, plaintiff sent a memorandum to Vice Chancellor of Student Affairs Carol Wall and defendants Warzecka, Franks, and Gill–Fisher in which he thoughtfully analyzed the issue. (*See id.* Ex. FF (June 22, 1999 Burch Mem.).) Plaintiff started his memo by stating that "I am in the minority among my wrestling coach colleagues in believing that Title IX is a fair piece of legislation" and "[i]n fact I believe that Title IX doesn't go far enough toward equity for women in sport." (*Id.*) However, the purpose of plaintiff's memo was not to extol the virtues of Title IX but to lobby against the roster caps and for the *male* recruits of marginal potential who consequently would not have an opportunity to wrestle at UCD. (*Id.*)

6 (answering that on May 25, 2001, when plaintiff asked why his contract had been delayed, "Mr. Franks told [plaintiff] that his public support for the women wrestlers 'was making it very difficult for us to love you.'")).) In light of this evidence, and without making credibility judgments, it is difficult for the court to say defendants *would* have terminated plaintiff regardless of his speech activities.

Moreover, the court notes that this portion of the analysis of a free speech/retaliation claim generally presents a question of fact for the jury. *Soranno's Gasco, Inc. v. Morgan,* 874 F.2d 1310, 1315 (9th Cir. 1989). Summary judgment might be warranted in cases where the plaintiff has conceded that he would have been terminated regardless, where the defendants can point to similarly situated individuals who were fired for comparable reasons, or where a more qualified applicant was hired in lieu of the plaintiff. *See, e.g., Harris v. Shelby County Bd. of Educ.,* 99 F.3d 1078, 1085 (11th Cir.1996) (more qualified applicant). Presented with such facts, courts can say with confidence that defendants *would* have made the same decision. However, these circumstances are not present in this case and consequently, plaintiff's § 1983 claim must be heard by a jury.[21]

### b. *Summary Judgment for Defendant Vanderhoef*

■ As noted above, defendant Vanderhoef's individual motion for summary judgment is also before the court. Plaintiff has sued Vanderhoef based on allegations that Vanderhoef "has overall authority and control over the day-to-day operations of UC–Davis, including the athletic department,

the wrestling program, and its coaches" and thus is responsible in part for failing to prevent plaintiff's alleged retaliatory discharge at the direction of Warzecka. (Compl.¶ 12.)

However, a supervisor cannot be held liable under § 1983 on a respondeat superior basis, absent a statute stating otherwise. *Redman v. County of San Diego,* 942 F.2d 1435, 1446 (9th Cir.1991); *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989). "A supervisor may be liable under § 1983 only if there exists either '(1) his or her personal involvement in the constitutional deprivation, *or* (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Jeffers v. Gomez,* 267 F.3d 895, 915 (9th Cir.2001) (quoting *Redman,* 942 F.2d at 1446 (emphasis added)). Under the second pathway to liability, a sufficient causal connection exists when the supervisor was the "moving force" behind the alleged violation, as evidenced by the fact that (1) his "own culpable action or inaction in the training, supervision, or control of his subordinates" resulted in injury, (2) he acquiesced in the constitutional injuries complained of, or (3) his conduct shows "a reckless or callous indifference to the rights of others." *Larez v. City of Los Angeles,* 946 F.2d 630, 646 (9th Cir.1991) (citations omitted).

Vanderhoef denies any involvement in the decision not to renew plaintiff's contract and testified that he never discussed plaintiff's employment with Warzecka, Gill–Fisher, Swanson, or Franks. (Vanderhoef's SUF Ex. Y (Vanderhoef Decl. ¶ 3), Ex. BB (Warzecka Decl. ¶ 4).) Significantly, Warzecka (who was several lev-

---

**21.** *Williams v. Day,* 553 F.2d 1160 (8th Cir. 1977), highlighted by defendants at oral argument, is not to the contrary. In that case, the Eighth Circuit affirmed the District Court's finding, *after a trial,* that "[t]he decision was not in any way based upon the plaintiff's exercise of his First Amendment rights." *Id.* at 1163; *Williams v. Day,* 412 F.Supp. 336, 339–40 (E.D.Ark.1976).

els removed from Vanderhoef in the UCD organization charts) and Eleanor Sandoval (Human Resources), not Vanderhoef, were the signatories to plaintiff's most recent employment contracts on behalf of UCD. (Defs.' SUF Exs. L–M (contracts).) Additionally, the person with admitted authority to overrule plaintiff's termination, Associate Vice Chancellor Franks, was a subordinate of Vanderhoef's subordinate.[22] (Pl.'s SUF Ex. 15 (Franks Dep. 118:18–120:23).)

To challenge Vanderhoef's claimed lack of involvement, plaintiff contends that because Vanderhoef and Warzecka were friends and saw each other socially in work-related settings, Vanderhoef must have discussed the matter of plaintiff's employment with Warzecka. (*Id.* Ex. 14 (Vanderhoef Dep. 59:19–60:12, 64:18–19).) However, plaintiff's mere suspicions cannot refute Vanderhoef's *evidence* that he was not involved in the alleged deprivation of plaintiff's constitutional rights and that Vanderhoef and Warzecka did not discuss the matter. *See Karam v. City of Burbank*, 352 F.3d 1188, 1194 (9th Cir.2003) (noting that "speculation ... does not rise to the level of evidence sufficient to survive summary judgment").

Based on the actual evidence before the court, a factfinder could not reasonably infer that Vanderhoef was directly involved in the decision not to renew plaintiff's contract or that he was the moving force behind the decision. It is simply unreasonable to expect that a person who oversees an organization that employs over 27,000 people would have any involvement in employment decisions for positions that are several levels below him, especially when he had no reason, based on past behavior, to suspect that the involved subordinates were prone to abusing their power to effectuate constitutional violations. (Vanderhoef's SUF Ex. Z (Shimek Decl. ¶ 2), Ex. Y (Vanderhoef Decl. ¶ 6).) Moreover, as the Ninth Circuit has noted, to hold managers liable for "fail[ure] to overrule the unconstitutional discretionary acts of subordinates would simply smuggle *respondeat superior* liability into section 1983 law." *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir.1992) (addressing municipal liability). Summary judgment as to Vanderhoef is therefore warranted, as he cannot be held vicariously liable for Warzecka's and others' decision to terminate plaintiff.[23]

IT IS THEREFORE ORDERED that

22. As an aside, it is not clear that authority to overrule Warzecka's decision will open the door to § 1983 liability because "mere refusal [or failure] to overrule a subordinate's completed act does not constitute approval." *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir.1999); *cf. Ortez v. Wash. County, Or.,* 88 F.3d 804, 809 (9th Cir.1996) (observing that "supervisors are liable for the constitutional violations of their subordinates 'if the supervisor participated in or directed the violations, or knew of the violations and failed to act *to prevent* them' " (quoting *Taylor,* 880 F.2d at 1045) (emphasis added)).

23. In passing, defendants note that "[s]ince § 1983 does not provide for vicarious liability, ... FRANKS ... can [not] be liable for the contract decision absent evidence that [he] somehow caused the alleged constitutional vi-

olation." (Defs.' Mem. of P. & A. in Supp. of Mot. for Summ. J. 83.) Defendants attempt to further develop this argument in their reply, but these newly emphasized contentions are untimely. Moreover, because Vanderhoef's role in this case is sufficiently distinguishable from Franks' role, given that Franks was involved almost immediately after the women filed their OCR complaint and admittedly had discussions with Warzecka about the propriety of plaintiff's dismissal in light of that event, (Pl.'s Ex. 15 (Franks Dep. 87:20–90:21)), the court cannot say that the analysis applicable to Vanderhoef would automatically extend to Franks. Consequently, because defendants have not fully developed a supervisory liability argument with respect to Franks, the court declines to consider it.

# 1134

(1) defendants' motion for summary judgment as to UCD be, and the same hereby is, DENIED.

(2) defendants' motion for summary judgment as to defendants Warzecka, Gill–Fisher, Franks, and Swanson be, and the same hereby is, DENIED.

(3) defendants' motion for summary judgment as to defendant Vanderhoef be, and the same hereby is, GRANTED.