Robert JACKSON III

v.

**COUNTY OF SAN BERNARDINO et al.**

**Case No. EDCV 13-1650 JGB (DTBx)**

United States District Court, C.D. California.

Signed June 13, 2016

Attorney(s) Present for Plaintiff(s): Dale Galipo

Attorney(s) Present for Defendant(s): Anthony Sain

**Proceedings: Order: (1) DENYING Defendants' Motion for Summary Judgment (Dkt. No. 57); (2) SETTING a Final Pre-Trial Conference Date of June 27, 2016 and a Trial Date of July 12, 2016**

The Honorable JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

Before the Court is Defendants' motion for summary judgment. (Dkt. No. 57.) Af-

ter consideration of the papers filed in support of and in opposition to the motion, as well as the argument presented at the June 13, 2016 hearing, the Court DENIES the motion.

## I. BACKGROUND

On October 27, 2011, several Deputy Sheriffs with the San Bernardino County Sheriff's Department arrived at the residence of Plaintiff Robert Jackson III ("Plaintiff" or "Jackson") in Apple Valley, California, to investigate a crime. (First Amended Complaint ¶¶ 11, 12, Dkt. No. 35.) Jackson refused to come out of the house to speak with the deputies. (Id. ¶ 12.) After a several hour-long standoff, Jackson, who was hiding in the attic, removed a vent cover on the side of the house and began climbing out of it. (Id. ¶¶ 12, 13.) Jackson alleges that a Deputy Sheriff then struck him with a Taser dart while he was hanging out of the attic vent, which immobilized him and caused him to fall to the ground. (Id. ¶ 13.) He sustained serious injuries, including paralysis below his waist.

On September 13, 2013, Plaintiff filed a complaint against Defendants County of San Bernardino (the "County") and Does 1 through 50 alleging causes of action for excessive force in violation of the Fourth and Fourteenth Amendments and assault and battery. (Complaint, Dkt. No. 1.) On March 16, 2015, Plaintiff moved to amend the complaint to name certain Does, allege additional facts, and add an additional claim for negligence. (Dkt. No. 28.) On May 13, 2015, the Court granted Plaintiff's motion, (Dkt. No. 34), and Plaintiff filed his First Amended Complaint on May 19, 2015, ("FAC," Dkt. No. 35).

The FAC adds Defendants Detective Bannes, Sergeant Charbonneau, Detective Ades, and Detective Ogaz, each of whom are Deputy Sheriffs employed by the County. (FAC ¶ 7.) The FAC alleges four causes of action: (1) excessive force in violation of the Fourth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983 ("§ 1983"); (2) municipal liability for unconstitutional custom or policy pursuant to § 1983; (3) battery pursuant to Cal. Gov't Code § 820 and California common law; and (4) negligence pursuant to Cal. Gov't Code §§ 815.2, 820. All claims are pleaded against all named Defendants except for the second cause of action for municipal liability, which is pleaded only against the County and certain Doe Defendants.

On April 11, 2016, Plaintiff and Defendants stipulated to dismiss with prejudice: (1) Plaintiff's second cause of action for municipal liability; and (2) Defendants Ades, Charbonneau, Ogaz, and all Doe Defendants. (Dkt. No. 54.) The Court granted the parties' stipulation on April 14, 2016, leaving the following causes of action remaining: (1) a § 1983 claim for excessive force against Defendant Bannes; (2) a claim for battery/excessive force under California law against Bannes and the County; and (3) a claim for negligence under California law against Bannes and the County. (Dkt. No. 62.)

On April 15, 2016, Defendants Bannes and the County (herein, "Defendants") moved for summary judgment as to all claims against them. ("Mot.," Dkt. No. 57.) In support of their motion, Defendants filed the following documents:

● Statement of Uncontroverted Facts and Conclusions of Law, ("DSUF," Dkt. No. 59); and

● An Appendix of Evidence, containing seven declarations and exhibits attached thereto:

  ○ Declaration of Sgt. Casey Jiles, ("Jiles Decl.," Dkt. No. 60 at 6-131);

  ○ Declaration of Sgt. John Charbonneau, ("Charbonneau Decl.," Dkt. No. 60 at 133-157);

  ○ Declaration of Sgt. John Ades, ("Ades Decl.," Dkt. No. 60 at 159-167);

○ Declaration of Det. Eric Ogaz, ("Ogaz Decl.," Dkt. No. 60 at 169-177);

○ Declaration of Sgt. John Bannes, ("Bannes Decl.," Dkt. No. 60 at 179-188);

○ Declaration of Sgt. Kelly Craig, ("Craig Decl.," Dkt. No. 60 at 190-198); and

○ Declaration of Tony M. Sain, ("Sain Decl.," Dkt. No. 60 at 200-).

Plaintiff opposed Defendants' motion on April 22, 2016. ("Opp.," Dkt. No. 64.) In support of his opposition, Plaintiff submitted the following:

● Statement of Genuine Disputes of Material Fact and Additional Material Facts, ("PSUF," Dkt. No. 65);

● Declaration of Hang Le, ("Le Decl.," Dkt. No. 66 at 1-2, 14-174), attached to which are excerpts from the February 2, 2016 deposition of Robert Jackson, ("Jackson Dep.," Dkt. No. 66 at 15);

● Declaration of Robert Jackson III, ("Jackson Decl.," Dkt. No. 66 at 3-7); and

● Declaration of Roger A. Clark, ("Clark Decl.," Dkt. No. 66 at 8-13).

On May 2, 2016, Defendants filed a reply memorandum. ("Reply," Dkt. No. 69.) In support of their Reply, Defendants filed evidentiary objections to Plaintiff's evidence, (Dkt. No. 69-1), replied to Plaintiff's evidentiary objections to Defendants' evidence,[1] (Dkt. No. 69-2), and submitted a response to Plaintiffs' Statement of Genuine Disputes and Additional Material Facts, ("Reply to PSUF," Dkt. No. 70).

On May 16, 2016, Plaintiff filed a supplemental opposition to Defendants' motion to include new evidence from a recently taken deposition. ("Supp. Opp.," Dkt. No. 95.) Defendants filed a supplemental reply on May 23, 2016. ("Supp. Reply," Dkt. No. 101.) The Court held a hearing on the motion on June 13, 2016.

## II. LEGAL STANDARD

A motion for summary judgment shall be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson, 477 U.S. at 250, 106 S.Ct. 2505.

Generally, the burden is on the moving party to demonstrate its entitlement to

---

1. Both parties set forth numerous objections to the other's evidence. These objections are largely without merit. See Fraser v. Goodale, 342 F.3d 1032, 1036-37 (9th Cir.2003) (explaining that, at summary judgment stage, district courts may consider evidence with content that would be admissible at trial, even if form of evidence would not be admissible); Burch v. Regents of Univ. of Cal., 433 F.Supp.2d 1110, 1119 (E.D.Cal.2006) ("[O]bjection to evidence on the ground that it is irrelevant" is "duplicative of the summary judgment standard itself" and is thus "redundant" upon a motion for summary judgment.). The Court cautions the parties against making such voluminous evidentiary objections in the future, particularly where, as here, "every objection imaginable [was raised] without regard to whether the objections are necessary, or even useful, given the nature of summary judgment motions in general, and the facts of [this case] in particular. Burch, 433 F.Supp.2d at 1119. "Summary judgment is not a game of 'Gotcha!' in which missteps by the non-movant's counsel, rather the merits of the case, can dictate the outcome." Id. at 1120.

The Court does not rely on much of the evidence to which the parties object, and as such, the objections are largely moot. To the extent the Court relies on any evidence to which either party objects, it addresses the objections below.

summary judgment. Margolis v. Ryan, 140 F.3d 850, 852 (9th Cir.1998); Retail Clerks Union Local 648 v. Hub Pharmacy, Inc., 707 F.2d 1030, 1033 (9th Cir.1983). The moving party bears the initial burden of identifying the elements of the claim or defense and presenting evidence that it believes demonstrates the absence of an issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the non-moving party has the burden at trial, however, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case. Id. at 325, 106 S.Ct. 2548. Instead, the moving party's burden is met by pointing out an absence of evidence supporting the non-moving party's case. Id. The burden then shifts to the non-moving party to show that there is a genuine issue of material fact that must be resolved at trial. Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324, 106 S.Ct. 2548; Anderson, 477 U.S. at 256, 106 S.Ct. 2505. The non-moving party must make an affirmative showing on all matters placed in issue by the motion as to which it has the burden of proof at trial. Celotex, 477 U.S. at 322, 106 S.Ct. 2548; Anderson, 477 U.S. at 252, 106 S.Ct. 2505; see also William W. Schwarzer, A. Wallace Tashima & James M. Wagstaffe, Federal Civil Procedure Before Trial, 14:144. "This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence." In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir.2010) (citing Anderson, 477 U.S. at 252, 106 S.Ct. 2505). "The non-moving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue." Id. at 387 (citing Matsushi-ta Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248, 106 S.Ct. 2505. In ruling on a motion for summary judgment, the Court construes the evidence in the light most favorable to the non-moving party. Barlow v. Ground, 943 F.2d 1132, 1135 (9th Cir.1991); T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630–31 (9th Cir.1987).

## III. EVIDENCE ON THE RECORD

Each of Plaintiff's claims—excessive force, battery, and negligence—is premised on the following facts: Det. Bannes fired his Taser at Jackson while Jackson was in an elevated position coming out of the dormer vent of his attic, causing him to lose control of his muscles and fall to the ground headfirst, which paralyzed Jackson from the waist down. Defendants dispute Plaintiff's version of events, contending that Bannes did not fire his Taser at Jackson until Jackson had already fallen, and that Plaintiff's evidence supporting his theory of events is inadmissible and insufficient to create a triable issue of material fact. The Court first addresses the sufficiency of the evidence and then considers whether it raises a triable issue of fact as to the merits of Plaintiff's claims.

### A. Defendants' Evidence

On October 27, 2011, deputies from the San Bernardino County Sheriff's Department ("SBSD") were investigating the theft of steel building materials and had reason to believe Plaintiff may have stolen them.[2] (DSUF ¶¶ 1-3.) SBSD deputies

---

**2.** The Court notes that in support of Defendants' Statement of Undisputed Facts, as "evidence" Defendants cite to the Sheriff's Department Uniform Crime Report ("Crime Report," Ex. A to Jiles Decl.), and the De-tailed History for Police Incident # VC11300042 ("Detailed History," Ex. E to Jiles Decl.) Defendants contend that these police reports are admissible pursuant to the

drove to Plaintiff's house, where they observed two vehicles, one of which matched the description of a vehicle stolen earlier that morning. (Id. ¶ 5.) Beginning shortly after noon, SBSD deputies made multiple unsuccessful attempts to contact Jackson by knocking on the front door, calling his cell phone, making public address announcements from a patrol car and from a helicopter instructing occupants of the residence to come out with their hands up. (Id. ¶ 7.) Jackson did not surrender. (Id.) The deputies were advised by a neighbor that Jackson had told his neighbors, "Don't call the police, I have plenty of weapons, I have an arsenal to take care of the problem."[3] (Id. ¶ 9.)

At approximately 1:30 p.m., the SBSD Specialized Enforcement Division's High Desert Crime Impact Team ("HD CIT") was asked to serve a search warrant at Plaintiff's residence. (Id. ¶ 11.) The HD CIT unit included Sgt. Charbonneau, Det. Ades, Dep. Ogaz, and others, but not Det. Bannes. (Id.) Around 2:00 p.m., the deputies obtained a search warrant with a SWAT attachment. (Id. ¶ 18.) When Jackson determined that the officers were about to enter the house, he went into the attic to evade them. (Id. ¶ 19.) At approximately 3:28 p.m., after announcing the existence of the warrant, the HD CIT unit breached the residence. (Id. ¶ 21.) The officers could hear Jackson in the attic above the garage. (Id.)

At 3:35 p.m., Sgt. Charbonneau began giving Jackson multiple verbal commands to come down from the attic, show his hands, and surrender. (Id. ¶ 22.) Jackson does not remember specifically what was said, but he is sure that the deputies inside the house told him to come out and give himself up. (Id.; Jackson Dep. at 65:3-12.) Ten minutes later, the deputies cut a hole in the ceiling in order to see Jackson, which caused a mostly empty whiskey bottle to fall to the ground. (Id. ¶ 24.) At some point, Charbonneau discharged his Taser in dart mode through the hole in the ceiling, but it did not make contact with Jackson. (Id. ¶¶ 28, 29.) A deputy reported that he saw what appeared to be rifles in the garage, but they were actually Jackson's sons' BB guns. (Id. ¶ 30.) At about 3:57 p.m., Det. Ades deployed two flameless dry power oleoresin capsicum ("OC") expulsion canisters by hand into the attic space within about five minutes of each other. (Id. ¶ 35.)

Jackson then made an escape plan. (Id. ¶ 38.) His plan was to move to the north end of the attic, where he believed there were fewer officers, pop off the dormer vent, grab onto the eave to hoist or pull himself out and either do a pull-up onto

business records exception to the hearsay rule. However, only personal observations of police officers contained in police reports are generally admissible. See, e.g., Colvin v. United States, 479 F.2d 998, 1003 (9th Cir. 1973) ("Entries in a police report based on an officer's observation and knowledge may be admitted, but statements attributed to other persons are clearly hearsay, and inadmissible under the common law exception to the hearsay rule"); Rupf v. Yan, 85 Cal.App.4th 411, 430 n. 6, 102 Cal.Rptr.2d 157 (2000) (noting that "a police officer's report is admissible under Evidence Code section 1280 if it is based upon the observations of a public employee who had a duty to observe facts and report and record them correctly"). Accordingly, the Court does not credit all statements contained in the police reports for the truths of the matters asserted therein. Should Defendants seek admission of either police report at trial, they are cautioned that only entries in the report that are based on an officer's personal observation and knowledge will be admitted.

3. Plaintiff objects to this evidence as inadmissible hearsay. The Court does not consider the statement for the truth of the matter asserted, but for the effect on the listener, namely the police officers who—after hearing this statement—may have formed a belief as to whether Jackson was armed with weapons.

the roof to survey the situation or, if he did not see any officers on that side of the house, drop approximately 10 feet to the ground and run into the desert. (Id.) To execute this plan, Jackson then took hold of a crowbar, moved to the north end of the attic, and tucked himself into the rafters for an hour or more waiting for the helicopter to leave. (Id. ¶ 39.) One deputy saw Jackson holding the crowbar and transmitted it over the radio. (Id. ¶ 40.) Jackson knew that the officers wanted him to give himself up. (Id. ¶ 47.)

At 4:39 p.m., Charbonneau reported to the SWAT commander that Jackson had barricaded himself in the attic. (Id. ¶ 48.) The incident was then designated as a "SWAT call" and an "all SWAT" page was sent out to summon additional SWAT personnel. (Id.) Twenty minutes later, Det. Bannes received an "all SWAT" call or text message instructing all SWAT team members to respond to Jackson's residence. (Id. ¶ 49.) Bannes and fellow SWAT team member, Det. Craig, arrived at the residence for a briefing. (Id. ¶¶ 49, 50.) They were told the following information about Jackson: (1) he is a 6'4 Caucasian male weighing about 200 pounds; (2) he was suspected of grand theft, burglary, possession of stolen property, and grand theft auto; (3) he was a convicted felon with prior convictions for weapons possession charges, with a history of violence, including a prior arrest for assault with a deadly weapon on a peace officer; (4) he was believed to be inside the residence; (5) for several hours, he had refused to come out of the house and had failed to comply with instructions; (6) he was believed to be in possession of firearms; and (7) he had armed himself with a crowbar at one point while in the attic. (Id. ¶ 50.)

At approximately 6:00 p.m., the tactical tractor was "ready to go," the fire department and ambulance were instructed to stage at the command post, the SWAT perimeter was set, and additional light was requested at approximately 6:20 p.m. (Id. ¶ 51.) Bannes and Craig claim that they were assigned to take a position of cover and concealment across from the northeast corner of the house, and that at 6:17 p.m., they took a position about 75 to 85 feet way from the house, facing southeast toward the north end of the house.[4] (Id. ¶ 54.) Bannes was armed with a handgun, an M4 automatic rifle, and a breaching shotgun. (Id. ¶ 56.) Bannes claims that his breaching shotgun had been loaded so that the first round to be deployed would be a non-lethal bean bag round and the second round to be deployed would be a non-lethal Taser XREP round. (Id.) However, Defendants do not dispute that he did not load the shotgun himself and he does not remember who loaded the shotgun. (PSUF ¶ 107.) The XREP is a wireless projectile that causes neuromuscular incapacitation for about 20 seconds by attaching a dart head into the body while a second piece of projectile drops down to complete the electrical circuit. (DSUF ¶ 56.) Craig was armed with a handgun and an M4 automatic rifle. (Id.) At approximately 6:22 p.m., the helicopter left the scene. (Id. ¶ 57.) Jackson waited approximately five minutes and then stood up to attempt to escape. (Id.) Ades saw Jackson stand up and gave him verbal commands to show his hands. (Id. ¶ 58.) Ades reported Jackson's movements over the radio. (Id.)

At 6:30 p.m., Jackson removed the dormer vent from the attic wall on the north end of the house and, with his back facing the floor of the attic, wiggled out headfirst

---

4. Plaintiff disputes this fact and several of the facts that follow. The Court addresses Plaintiff's contentions below.

through the opening in the wall with his face toward the sky. (Id. ¶ 60.) He lifted either one or both of his arms toward the top of the house, grasped the eave, and pulled himself out until he was about halfway out. (Id.) As he attempted to turn around, Bannes claims that he saw Jackson "seem to pop out of the vent, as though he had dived out, and he then fell head first to the ground." (Bannes Decl. ¶ 13.) He claims he said Jackson's head impact the ground and his arms attempt to brace the fall, followed by his body "crumpling over him." (Id.) Craig also claims that he saw Jackson "abruptly" come out of the vent, "as though he had dived out, and he fell head first to the ground." (Craig Decl. ¶ 13.) He claims he saw Jackson's head impact the ground, bracing by his arms on the ground, and then his body "crumpled over." (Id.) At this point, Bannes contends that he and Craig were about 60 to 70 feet from the north wall of the house. (Bannes Decl. ¶ 13.) Craig contends he and Bannes were about 50 feet from the house. (Craig Decl. ¶ 12.)

After Jackson fell, Craig and Bannes state that they accelerated their approach toward Jackson, who was on the ground. (Bannes Decl. ¶ 14.) As they were running toward the house, Bannes saw Jackson push himself up from the ground, with his chest and face raised more than a foot off the ground. (Id. ¶ 15.) Bannes believed Jackson's position looked like he was preparing to stand up so that he could either charge them or flee. (Id.) In response, he gave Jackson commands to lay down, with which Jackson failed to comply. (Id.) Bannes then discharged his breaching shotgun, deploying a non-lethal bean bag round at Jackson's left upper torso. (Id. ¶ 16.) Bannes believed the bean bag round missed, and less than a second later, he deployed the Taser XREP round. (Id. ¶¶ 17, 18.) The XREP round struck Jackson in the lower left side of his front abdomen. (Id. ¶ 18.) Jackson crumpled to

the ground and became rigid for 20 seconds. (Id.) No other officers were present on the north side of the house at that time. (Id. ¶ 20.)

Craig and Bannes then detained Jackson until the paramedics arrived. (Id. ¶¶ 19, 22.) Bannes told the paramedics that he deployed both the bean bag round and the XREP round at Jackson, and that he believed the bean bag round missed but the XREP struck his lower left front abdomen. (Id. ¶ 22.) Jackson suffered paralysis from the waist down as a result of his fall from the attic vent.

One or two days after the incident, Charbonneau visited Jackson in the hospital "as part of [his] investigation regarding the use of force on the evening of the incident." (Charbonneau Decl. ¶ 46.) During his interview with Jackson—which was audio-recorded and submitted as evidence—Jackson told Charbonneau, "I came out of the window, tried to turn around and get myself up on the roof, and I slipped off and I fell." (Id.; see also Exs. H & I to Jiles Decl.) When Charbonneau explained to Jackson that he had been hit with a Taser XREP round, Jackson said to Charbonneau, "Why the hell did they do that? I already fell down." (Id.) Charbonneau also told Jackson that he had attempted to hit him with a Taser dart while he was in the attic, to which Jackson replied, "Is that why I fell?" (Ex. I to Jiles Decl. at COSB002118.)

## B. Plaintiff's Evidence

In opposition to Defendants' motion, Plaintiff submits his declaration as well as excerpts from his February 3, 2016 deposition. Plaintiff also submitted excerpts from the April 25, 2016 deposition of Kory Layton, a paramedic who responded to the scene, which the Court addresses below.

### 1. Jackson's Deposition and Declaration

At his deposition, Jackson stated that after he took off the dormer vent in attic, he started to pull himself out by placing one hand on the frame of the vent hole and another on the eave. (Jackson Dep. at 74.) He was about hip level when he heard a pop and felt a sting in his left side. (Id. at 74-75.) He felt like he was being shocked and "lost complete muscle control." (Id. at 75.) He lost his grip on the sill and fell headfirst to the ground. (Id.) Once on the ground, Jackson felt someone standing on his head with one foot, pressing his face into the ground. (Id. at 76.) He heard one of the deputies say something about a probe being stuck in him and that he must have fallen on it. (Id. at 98.) He woke up at the hospital, but he did not remember being visited by any law enforcement person at the hospital. (Id. at 103.)

In his declaration, Jackson reiterates the same facts. He states that when he was about halfway out of the dormer vent, he heard a "pop," and immediately thereafter he felt an impact in his left abdomen area. (Jackson Decl. ¶¶ 16, 17.) At this point he was partly outside of the dormer vent and elevated approximately 10-15 feet above the ground. (Id. ¶ 17.) At the time of the impact, he felt a shocking sensation, locking his body up, and he lost control of his muscles. (Id. ¶ 18.) Once his muscles locked up, he was unable to keep his grip and he fell from the dormer vent. (Id. ¶ 19.) As he was falling, he was still unable to control his muscles and was unable to brace his fall. (Id. ¶¶ 20, 21.) He fell head-first towards the ground. (Id. ¶ 22.) After the fall, the left front side of his body was pressed against the ground and he heard an officer say that he had fallen on a probe. (Id. ¶ 25.) Jackson also stated that he did not do a push up motion after falling and that he never tried to stand up. (Id. ¶¶ 31, 32.) Jackson does not recall speaking to Charbonneau at the hospital. (Id. ¶ 36.) He states that when he was at the hospital, he was on "heavy medication, not coherent, and under severe distress and pain." (Id. ¶ 35.)

Defendants argue that Jackson's declaration and deposition testimony do not create a genuine dispute as to whether Jackson was struck with the Taser dart while in an elevated position because this evidence is barred by the "sham affidavit" rule. (Mot. at 14.) Specifically, Defendants contend that Jackson cannot use his subsequent deposition testimony and declaration to contradict his statement to Charbonneau in the hospital. Defendants are incorrect. It is true that "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999). However, the sham affidavit rule is limited to prior statements made under oath. See Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir.1999).

In Leslie, the plaintiff opposed the defendant's motion for summary judgment by submitting a sworn declaration and deposition testimony which purported to create a genuine dispute of material fact. Leslie, 198 F.3d at 1158. The district court excluded the declaration and the deposition testimony under the sham affidavit rule because it contradicted the plaintiff's prior statements written in unsworn letters. Id. The Ninth Circuit reversed, holding that the sham affidavit rule did not apply because the plaintiff's deposition testimony and sworn declaration were consistent and under oath and contradicted only by his unsworn letters. Id. Additionally, the plaintiff's deposition testimony and

sworn declaration sought to explain his prior statements. Id. (citing Messick v. Horizon Indus., Inc., 62 F.3d 1227, 1231 (9th Cir.1995) (even under the "sham affidavit" doctrine, "the non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony"); Seshadri v. Kasraian, 130 F.3d 798, 804 (7th Cir.1997) (recognizing "that a party might be able to explain away his prior inconsistent statements" and stating that a party should be bound by such statements only if they are unexplained)). For these reasons, the Ninth Circuit found the district court erred by rejecting the plaintiff's evidence and that the declaration and the deposition testimony created a genuine dispute of fact that needed to be resolved at trial. Id. at 1159.

Leslie controls here.[5] Jackson submitted a sworn declaration and deposition testi-

---

5. At the hearing on this motion, counsel for Defendants represented to the Court that the cases cited in Defendants' moving papers discuss Leslie and "interpret[ ] the sham affidavit rule to apply to recorded statements" because recorded statements "have the same kind of guarantor of credibility of authenticity that a sworn statement does." This is false. None of the cases cited by Defendants made any such analysis. Defendants cite three cases which issued after Leslie and which applied the sham affidavit rule to a plaintiff's prior unsworn statements in a motion for summary judgment. See Rogers v. Phoenix Police Dep't, No. CV07–0195–PHX–DGCDKD, 2008 WL 5156092, at *7 (D.Ariz. Dec. 9, 2008); Cable v. City of Phoenix, No. CV–12–00216–PHX–JAT, 2013 WL 6532023, at *11, n. 13 (D.Ariz. Dec. 13, 2013), aff'd in part, rev'd in part and remanded, 647 Fed.Appx. 780 (9th Cir.2016); Kibbee v. City of Portland, No. CV–98–675–ST, 1999 WL 1271868, *4–5 (D.Or. Dec. 23, 1999).

The first, Rogers v. Phoenix Police Dep't, does not cite Leslie. Rogers applied the sham affidavit rule to exclude a plaintiff's declaration submitted in opposition to a motion for summary where that declaration contradicted unsworn statements the plaintiff had previously made to the police. See 2008 WL 5156092, at *7. Rogers does not acknowledge Leslie's holding that unsworn statements cannot be the basis for striking subsequent and contradictory sworn testimony. In light of Rogers' failure to follow binding Ninth Circuit precedent, the Court does not follow it.

The second, Cable v. City of Phoenix, also does not cite Leslie. There, the district court disregarded the plaintiff's deposition testimony where it contradicted previous unsworn statements that the plaintiff made to "disinterested third parties." 2013 WL 6532023, at *11, n. 13. The court held that to find for the plaintiff, a juror would have to disregard not only the plaintiff's prior statements, but also the medical findings of the plaintiff's treating providers as well as the defendants' uncontroverted expert witnesses. Id. "Such a juror would not be reasonable." Id. Cable, like Rogers, did not cite to Leslie nor acknowledge its holding that unsworn testimony cannot be the basis for striking subsequent and contradictory sworn testimony. The Ninth Circuit reversed Cable in an unpublished memorandum, concluding that genuine issues of material fact precluded summary judgment. 647 Fed.Appx. at 781–82. Accordingly, the Court does not follow the district court's decision in Cable.

Third case, Kibbee v. City of Portland, is the only case relied upon by Defendants which cites Leslie, and Kibbee explicitly states, "Unsworn testimony cannot be the basis for striking subsequent and contradictory sworn testimony." 1999 WL 1271868, *4. There, the district court considered whether the plaintiff's tape recorded statement to police barred her subsequent deposition testimony. Id. at *4–5. Distinguishing Leslie, the court treated the plaintiff's prior unsworn statements as sworn testimony "for purposes of this motion" only because "plaintiff affirmed the truthfulness and accuracy of her taped recorded statement in her sworn deposition, and also relied on it in her pleadings opposing summary judgment." There was no discussion regarding recorded statements having "the same kind of guarantor of credibility of authenticity that a sworn statement does." Rather, the court ultimately declined to apply the sham affidavit rule because at the time of the police interview, plaintiff had just had "a long and traumatic night, without the benefit of preparation or notice, and without friends, family or counsel," whereas her later deposi-

mony, each of which provides a consistent account of how he fell from the attic—specifically, that he felt the Taser dart hit him in the abdomen when he was sticking out of the attic vent, and that this caused him to lose control of his muscles, which precipitated his fall headfirst to the ground where unable to brace himself with his arms. Moreover, Jackson's declaration states that he was heavily medicated while at the hospital and under severe distress and pain, which tends to explain why his statements to Charbonneau contradicted his later testimony.[6] Accordingly, the Court will not apply the sham affidavit rule. The Court finds that Jackson has created a disputed issue of fact regarding whether Jackson was shot with the Taser dart in an elevated position when he was still in the attic vent, as he testified, or whether he was shot with the Taser dart after he fell, as Bannes and Craig claim.

## 2. Layton Deposition

In addition to Jackson's declaration and testimony, Plaintiff submits the deposition of Kory Layton, a paramedic who responded to the scene on the date of the incident. ("Layton Dep.," Dkt. No. 95-1 at 5.) Layton testified that one of the sheriff's deputies on the scene told him that Jackson had been shot in his lower left abdomen with a 12-gauge Taser dart while Jackson was still elevated in the attic vent. (Layton Dep. at 55.) Layton also testified that one of the deputies told him that Jackson was shot with the bean bag round after he had fallen to the ground. (Id.) Layton does not

recall which deputy told him this information nor what he looked like. (Id.) He testified that there were probably 25-30 or more deputies on scene. (Id.)

Defendants argue that Layton's deposition testimony is inadmissible because it is hearsay. (Supp. Reply at 1.) Layton's deposition testimony is certainly admissible against the County as an opposing party's statement because Layton testified that he was told this information by an SBSD deputy. See Fed. R. Evid. 801(d)(2)(D) (statements are not hearsay when made by a party's employee on a matter within the scope of that relationship and offered against the employer). Layton's testimony may also be admissible against Bannes. Plaintiff submits circumstantial evidence which would tend to show that it was in fact Bannes who made the statement: Bannes is the only deputy who has stated that he spoke to the paramedics. (Bannes Decl. ¶ 22.) However, the Court need not reach this issue now because it finds that Jackson's own statements are sufficient to create a triable issue of fact on this point. The Court now addresses whether this disputed fact is sufficient to overcome Defendants' motion for summary judgment as to each of Plaintiff's claims.

## IV. DISCUSSION

Upon review of the evidence submitted by the parties, and for the following reasons, the Court finds that Plaintiff has raised a triable issue of material fact as to each of his three remaining claims, and on

tion "was taken with certain formalities that encourage truthfulness, accuracy, and fairness." Id. at *7. As such, Kibbee supports this Court's holding that the sham affidavit rule should not bar Jackson's sworn declaration and deposition.

None of the cases relied upon by Defendants alters the holding in Leslie. The Court cautions counsel for Defendants against making representations to the Court in the future that are not grounded in either fact or law.

6. During Charbonneau's hospital interview of Jackson, Jackson told Charbonneau that he kept "going in and out, you know, they give me medication," and he asked Charbonneau if the reason he fell was because Charbonneau struck him with a Taser dart. (Ex. I to Jiles Decl.) Viewing the facts in a light most favorable to Jackson, these statements tend to demonstrate that Jackson may have been in a confused state when Charbonneau interviewed him at the hospital.

that basis, denies Defendants' motion for summary judgment.

## A. Section 1983 Claim for Excessive Force

Plaintiff's claim for excessive force in violation of the Fourth Amendment is alleged against Det. Bannes only. (Dkt. No. 62.) Bannes makes three arguments with respect to this claim. First, he contends that the claim is barred by Heck v. Humphrey because Jackson pled no contest to a misdemeanor charge of resisting arrest. (Mot. at 11-13.) Second, he argues that even if the claim is not barred, he acted reasonably. (Id. at 13.) Third, he argues that even if he did not act reasonably, he is entitled to qualified immunity. (Id. at 21-23.)

### 1. Heck

■ Under Heck v. Humphrey, when a plaintiff who has been convicted of a crime under state law seeks damages in a § 1983 suit, "the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence." Heck v. Humphrey, 512 U.S. 477, 487, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). If it would, the complaint must be dismissed. Id.

■ In connection with his arrest on October 27, 2011, Jackson pled no contest and was convicted of resisting arrest in violation of California Penal Code § 148(a)(1).[7] (PSUF ¶ 134.) For a conviction to be valid under § 148(a)(1), the defendant must have resisted, delayed or obstructed the officer during the lawful discharge of his or her duties. "The lawfulness of the officer's conduct is an essential element of the offense." Hooper v. Cnty. of San Diego, 629 F.3d 1127, 1130 (9th Cir. 2011) (citing People v. Curtis, 70 Cal.2d 347, 354-56, 357, 74 Cal.Rptr. 713, 450 P.2d 33 (1969)).

■ Bannes argues that because Plaintiff pled no contest to resisting arrest and the lawfulness of the officer's conduct is an essential element of that offense, he is barred from arguing that the officers' conduct was unlawful at any point during the encounter. (Mot. at 12.) This is not the law. A conviction under § 148(a)(1) is valid as long as "at some time during a continuous transaction an individual resisted, delayed, or obstructed an officer when the officer was acting lawfully." Hooper, 629 F.3d at 1132. If an officer acted unlawfully at some other point during the same transaction, Heck does not bar the plaintiff from bringing a claim under § 1983. In that case, "two isolated factual contexts [ ] exist, the first giving rise to criminal liability on the part of the criminal defendant, and the second giving rise to civil liability on the part of the arresting officer." Id.

For example, in Hooper, private security guards detained Hooper on suspicion of shoplifting. Id. at 1129. Hooper was calm and compliant when the arresting officer arrived, and gave the officer the keys to her car to perform a search. Id. When the officer discovered a substance he believed to be methamphetamine in Hooper's car, he grabbed Hooper and told her she was under arrest. Id. Hooper jerked her hand away. Id. In the struggle that ensued, Hooper ended up on the ground with the officer on top of her back. Id. The officer then called for his dog, who bit Hooper's head, lost its hold and then bit and held

---

7. The minutes from Plaintiff's change of plea hearing—which is the only court document the Court has of Plaintiff's conviction— state, "By leave of court, Defendant withdraws plea of not guilty. Defendant is informed of elements of the charge(s). Factual basis estab-

lished. Action came on for change of plea... Defendant pleads nolo contendere to count(s) 1 [resisting arrest under § 148(a)(1)]. The Court accepts the plea and finds the Defendant guilty as charged." (See Ex. 6 to Jackson Decl., Dkt. No. 66 at 106.)

her head again until backup arrived. Id. Hooper pled guilty to violating § 148(a)(1), and later brought a claim of excessive force under § 1983. Id. The Ninth Circuit held that Heck did not bar Hooper's excessive force claims, because a finding that the use of the dog was excessive force "would not negate the lawfulness of the initial arrest attempt, or negate the unlawfulness of Hooper's attempt to resist it when she jerked her hand away [from the officer]." Id. at 1133.

Heck does not bar Plaintiff's claim. Plaintiff was engaged in a several hours-long standoff with the SBSD deputies. Jackson admits that the deputies had the right to arrest him that day. (DSUF ¶ 52.) Jackson alleges that Bannes used excessive force only when he deployed the Taser dart while Jackson was in an elevated position and then struck him with a bean bag round when Jackson was on the ground. Jackson does not allege that the deputies used excessive force in the hours leading up to the fall, during which he "was passively resisting and evading, obstructing, or delaying the officers for several hours... by not complying with orders to surrender himself and hiding in the attic instead of coming out as requested."[8] (Opp. at 8.) Accordingly, as in Hooper, "two isolated factual contexts [ ] exist, the first giving rise to criminal liability on the part of the criminal defendant, and the second giving rise to civil liability on the part of the arresting officer." 629 F.3d at 1132. For these reasons, the Court finds that

Heck does not bar Plaintiff's § 1983 claim for excessive force.

**2. Reasonableness under Graham**

■ A Fourth Amendment claim that law enforcement officers have used excessive force—deadly or otherwise—in the course of an arrest is analyzed under the "reasonableness" standard. Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The reasonableness standard requires balancing the "nature and quality of the intrusion" on a person's liberty with the "countervailing governmental interests at stake" to determine whether the use of force was objectively reasonable under the circumstances. Id. at 396, 109 S.Ct. 1865. "The question is not simply whether the force was necessary to accomplish a legitimate police objective; it is whether the force used was reasonable in light of all the relevant circumstances." Hammer v. Gross, 932 F.2d 842, 846 (9th Cir.1991) (emphasis in original).

■ Relevant factors in the Fourth Amendment reasonableness inquiry include "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396, 109 S.Ct. 1865. Other factors relevant to the inquiry include the feasibility of alternative methods of capturing or subduing a suspect, Bryan v. MacPherson, 630 F.3d 805, 813 (9th Cir.2010), and the giving of a warning prior to the use of force,

8. In his Reply, Bannes argues that Heck bars Plaintiff's claim because Jackson maintains that he was not resisting arrest "throughout the course of the entire incident." (Reply at 3.) Some district courts have held that where the plaintiff is convicted of resisting arrest, but maintains in his civil suit that he did not actually resist, Heck bars the excessive force claim in its entirety. See Rodriguez v. City of Modesto, No. CV F 10–1370 LJO MJS, 2011

WL 2224765, at *8 (E.D.Cal. June 7, 2011); Webb v. City & Cty. of San Francisco, No. C 11–00476 CRB, 2011 WL 6151605, at *7 (N.D.Cal. Dec. 12, 2011). However, the reasoning of these cases does not apply here. Jackson admits to resisting arrest, albeit "passively," and he admits that the deputies had a right to arrest him. Accordingly, those cases are inapposite.

Nelson v. City of Davis, 685 F.3d 867, 882 (9th Cir.2012).

"Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." Santos v. Gates, 287 F.3d 846, 853 (9th Cir.2002); see also Liston v. County of Riverside, 120 F.3d 965, 976 n. 10 (9th Cir.1997) (as amended) ("We have held repeatedly that the reasonableness of force used is ordinarily a question of fact for the jury."). "This is because such cases almost always turn on a jury's credibility determinations." Smith v. City of Hemet, 394 F.3d 689, 701 (9th Cir.2005). This case is no different.

■ Bannes contends that his use of force was reasonable because he used non-lethal force on a non-compliant suspect that may have been armed and appeared to be either attempting to charge him or to flee. (Mot. at 20-21.) However, Bannes' argument rests upon his version of events—that he struck Jackson with the Taser dart after Jackson fell from the attic vent, not before. As previously stated, the Court finds Jackson has raised a triable issue of fact as to the timing of Bannes' Taser dart. Viewing the facts in a light most favorable to Plaintiff, if Bannes fired the Taser at Jackson while he was in an elevated position, the question becomes whether that use of force is reasonable under the totality of the circumstances. The Court concludes that a reasonable jury could find that it is not.

Bannes does not argue that his actions would have been reasonable if he shot Jackson with the Taser dart while Jackson was at a high elevation. Plaintiff submitted a police practices expert, Roger A. Clark, who opined that using a Taser or Taser XREP round on a person who is elevated 10-15 feet off the ground is likely to cause serious bodily injury or death based on police officer training. (Clark Decl. ¶ 7.) Moreover, County policy states that less-than-lethal force, including Tasers, should not be used on "people in danger of falling to their death."[9] (Ex. 8 to Clark Decl.) Accordingly, the use of a Taser XREP round on a person who is elevated 10-15 feet off the ground may no longer be a "less-than-lethal" use of force—it may be lethal.

The law in the Ninth Circuit "requires that a reasonable officer under the circumstances believe herself or others to face a threat of serious physical harm before using deadly force." Price v. Sery, 513 F.3d 962, 971 (9th Cir.2008). Bannes has not established undisputed facts which demon-

---

9. Defendants object to Exhibits 8, 9, and 10 of the Clark Declaration on the grounds of lack of authentication and hearsay. (Dkt. No. 69-1 ¶ 90.) Although the Ninth Circuit has required documents to be properly authenticated on a motion for summary judgment, "[w]hether the authentication requirement should be applied to bar evidence when its authenticity is not actually disputed is... questionable." Burch, 433 F.Supp.2d at 1120. Significantly, the Ninth Circuit has held that a district court's consideration of unauthenticated evidence in conjunction with a motion for summary judgment is harmless error when a competent witness with personal knowledge could have authenticated the document. Hal Roach Studios, Inc. v. Feiner & Co., 896 F.2d 1542, 1552 (9th Cir.1990). Because Defendants do not actually dispute the authenticity of this policy and because presumably a County employee will be able to authenticate it at trial, this objection is OVERRULED. Defendants' hearsay objection as to the policy is also OVERRULED. The policy is not offered for its truth, but for the training practices of the SBSD. As to the remaining exhibits, Defendants' objections are likewise OVERRULED because they were relied upon by Mr. Clark, an expert, and experts are permitted to base their opinions on inadmissible evidence. Williams v. Illinois, 567 U.S. 50, 132 S.Ct. 2221, 2224, 183 L.Ed.2d 89 (2012).

strate that he or others faces a threat of serious physical harm. At the time Jackson was climbing out of the dormer vent, he was not holding a crowbar and did not have any weapons visible in his hands. (Bannes Deposition at 10-11, 35, Ex. 4 to Le Decl.) Bannes and Craig were the only officers on that side of the house, and by their own account were over 50 feet away. (Bannes Decl. ¶¶ 13, 20; Craig Decl. ¶¶ 12, 20.) There are no facts which would justify the use of lethal force against Jackson at the time Bannes allegedly deployed the Taser dart if Jackson was in an elevated position. Significantly, Bannes does not contend that use of lethal force was reasonable—only non-lethal. Viewing the facts in a light most favorable to Plaintiff, the Court does not find that Bannes' use of force as a matter of law was reasonable under the totality of the circumstances.

### 3. Qualified Immunity

"Qualified immunity shields an officer from suit when [ ] he makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances [ ] he confronted." Brosseau v. Haugen, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004). "[T]he salient question... is whether the state of the law [at the time of the alleged wrong] gave respondents fair warning that their alleged treatment of [the petitioner] was unconstitutional." Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). The Ninth Circuit has held that training officers received from their own police department alerting officers to the risk of serious injury or death with regards to a specific type of force used under certain circumstances is "fair warning" that the force is unreasonable under those circumstances. Drummond ex rel. Drummond v. City of Anaheim, 343 F.3d 1052, 1062 (9th Cir.2003).

SBSD officers are explicitly trained that they cannot deploy the Taser

XREP round or the bean bag round at an individual who is in an elevated position because it can cause the individual to fall and the muscle incapacitation effects of the Taser XREP round can prevent the individual from bracing his or her fall. (PSUF 135.) Thus, Bannes was trained that use of a Taser XREP round on an elevated individual is likely to cause serious bodily injury or death. In the Ninth Circuit, it is settled that in order to use lethal force, a reasonable officer under the same circumstances must believe himself or others face a threat of serious physical harm. Price, 513 F.3d at 971. As stated above, Bannes has not established undisputed facts which demonstrate he or others faced a serious threat of serious physical harm. Accordingly, viewing the facts in a light most favorable to Plaintiff, Bannes had more than fair warning that use of a Taser dart on an elevated person is likely to cause risk of serious bodily injury or death and that the use lethal force is unreasonable. Bannes has therefore not established that he is entitled to qualified immunity.

For the foregoing reasons, Bannes' motion for summary judgment on this claim is DENIED.

### B. State Law Claims for Battery and Negligence

For Defendants to prevail on summary judgment on Plaintiff's state law claims of negligence and battery, the undisputed facts must demonstrate that the Bannes' use of force against Jackson was reasonable. See Brown v. Ransweiler, 171 Cal.App.4th 516, 527, 89 Cal.Rptr.3d 801 (2009) (because a police officer is "charged with acting affirmatively and using force as part of their duties," a plaintiff suing on grounds of battery resulting from police action must prove that "the police officer's use of force was unreasonable"); Hayes v. Cnty. of San Diego, 57 Cal.4th 622, 629,

160 Cal.Rptr.3d 684, 305 P.3d 252 (2013) (in analyzing whether law enforcement officers owe individuals a duty, the California Supreme Court "has long recognized that peace officers have a duty to act reasonably when using deadly force").

As stated above, a disputed issue of fact remains as to whether Bannes' use of force was reasonable. (See § IV.A.) Viewing the facts as asserted by Plaintiff, Bannes deployed lethal force when he knowingly struck Jackson with a Taser dart while Jackson was in an elevated position. Bannes does not argue that lethal force was reasonable in such a circumstance. And contrary to Defendants' contention, the County is vicariously liable for the acts of Det. Bannes to the extent Bannes acted unlawfully and is not immune from liability. Robinson v. Solano Cty., 278 F.3d 1007, 1016 (9th Cir.2002) ("California, however, has rejected the Monell rule and imposes liability on counties under the doctrine of respondeat superior for acts of county employees; it grants immunity to counties only where the public employee would also be immune.").

Accordingly, Defendants' motion for summary judgment as to these claims is DENIED.

### C. Punitive Damages

■ Defendants seek summary judgment on Plaintiff's claim for punitive damages. (Mot. at 25.) Defendants argue that there is no evidence that Bannes acted with malice, oppression, or reckless disregard toward Jackson in exercising force. (Id.)

■ "Determinations related to assessment of punitive damages have traditionally been left to the discretion of the jury." Egan v. Mut. of Omaha Ins. Co., 24 Cal.3d 809, 821, 169 Cal.Rptr. 691, 620 P.2d 141 (1979). "[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Smith v. Wade, 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983).

Because Plaintiff has raised a triable issue of fact as to whether Bannes knowingly deployed a Taser dart when Jackson was elevated 10-15 feet off of the ground—and that Bannes knew such a use of force could cause serious bodily harm or death—the Court cannot find that Plaintiff is not entitled to punitive damages as a matter of law.

### V. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is DENIED. (Dkt. No. 57.)

The Court hereby SETS a final pretrial conference for **Monday, June 27, 2016 at 11:00 a.m.**, at which time the Court will address Defendants' motion to facilitate jury selection by written questionnaire, (dkt. no. 72), as well as the parties' respective motions in limine, (dkt. nos. 77-85). The Court SETS a trial date of **Tuesday, July 12, 2016 at 8:30 a.m.** (At the hearing the court stated July 11, 2016. The correct trial date is July 12, 2016, at 8:30 a.m.)

**IT IS SO ORDERED.**